770 So.2d 365 (2000)
STATE of Louisiana
v.
David WOMMACK.
No. 00-137.
Court of Appeal of Louisiana, Third Circuit.
June 7, 2000.
*367 David W. Burton, DeRidder, LA, Counsel for Appellee.
Edward K. Bauman, Lake Charles, LA, Counsel for Defendant/Appellant.
(Court composed of Judge BILLIE COLOMBARO WOODARD, Judge JIMMIE C. PETERS and Judge MARC T. AMY).
AMY, Judge.
The defendant was convicted of attempted second degree murder and simple burglary. He was subsequently sentenced to twenty-one years at hard labor without the possibility of probation, parole, or suspension of sentence for the attempted second degree murder conviction. A concurrent five-year sentence was imposed for the simple burglary conviction. The defendant appeals the convictions as well as the sentence for attempted second degree murder. For the following reasons, we affirm.

Factual and Procedural Background
The events at issue in this case occurred shortly after 11:00 p.m. on the night of June 13, 1997 in Beauregard Parish. After closing, Janet Doyle Smith and two employees, Kitty Wingate and Reed Wingate left "Coach's," a restaurant owned and operated by Ms. Smith. The three went to their individual vehicles. According to Ms. Smith, she entered her van, sat in the driver's seat, and, after hearing a noise, was grabbed by an assailant located in the back of the van. She described the assailant as holding a large cloth over her *368 mouth with one hand while using the other hand to grab her throat and squeeze it. She stated that she was unable to breathe.
Ms. Smith testified that the assailant said, "I'm going to kill you." She recognized the voice as that of the defendant, David Wommack, an employee at the restaurant. According to Ms. Smith, she and the assailant began to struggle. She stated that she was able to release his grip from her neck so that she could speak. She testified that she said: "David, don't do this to me." The assailant responded: "My name is not David; I don't know who the f[-] you're talking about." The assailant also stated: "Don't make me cut you." Ms. Smith testified that, during the struggle, she found the assailant's arm near her mouth and that she bit him. Ms. Smith continued to struggle and was eventually able to open the van door, falling out of the van and onto her neck. She then ran to the car of Ms. Wingate, who had paused in the parking lot to wait for Ms. Smith.
Ms. Wingate testified she looked into her rearview mirror and saw the disheveled Ms. Smith running to her car. Smith got in, and the pair sped away. Immediately thereafter, they spotted a patrol car from the DeRidder Police Department and signaled the officer to stop. Ms. Smith then ran to the patrol car and informed Detective Kenneth Pine, an investigator with the department at the time, that: "David Wommack just tried to kill me." Detective Pine testified Ms. Smith had blood on her face and marks on her neck. He then proceeded to Coach's parking lot, located the van, which still had the door open, and began an investigation. He found a skirt located between the driver and passenger seats and Ms. Smith's hair bow on the ground just outside of the van. He also found Ms. Smith's shoes on top of the dashboard. Pine stated that Ms. Smith also returned to the scene, reiterated that the defendant was the assailant, and further stated that she had bitten the defendant's left forearm.
Detective Pine and Detective Ricky Johnson, a criminal investigator with the DeRidder Police Department, located the defendant at Ferddie Flores' house, in the morning hours of June 14. They both stated that the shirt he attempted to put on had what appeared to be a reddish stain on it and that his left arm bore a wound. Wommack was taken into custody. On June 27, 1997, a bill of information was filed against the defendant for attempted second degree murder, a violation of La. R.S. 14:27 and La.R.S. 14:30.1. Subsequently, on June 14, 1999, the district attorney amended the bill to add a charge of simple burglary, a violation of La.R.S. 14:62.
Following a jury trial, the defendant was found guilty of both charges. The defendant was sentenced to twenty-one years at hard labor, without benefit of probation, parole, or suspension of sentence for the attempted murder conviction. At a separate sentencing hearing, a concurrent, five-year sentence was imposed for the simple burglary conviction. The defendant appeals.
The defendant's appellate counsel assigns the following as error:
1. The evidence presented at trial, when viewed in a light most favorable to the prosecution, was insufficient to sustain verdicts of guilty as charged.
2. The trial court erred in allowing Dr. Roger Downs and Dr. Terry Welke to testify as experts.
3. The trial court erred in refusing to grant a mistrial and in denying defense counsel's motion to strike.
4. The trial court erred in imposing a constitutionally excessive sentence.
The defendant has also filed a separate, pro se brief. As did his appellate counsel, the defendant contends the evidence presented was insufficient to support the convictions, Dr. Downs and Dr. Welke were erroneously permitted to offer expert testimony, and the twenty-one year sentence *369 imposed was excessive. Additionally, he contends his Sixth Amendment right to confront adverse witnesses was violated when the trial court sustained an objection to his attorney's questioning of Ms. Smith and that his trial counsel was ineffective.

Discussion

Errors Patent
Pursuant to La.Code Crim.P. art. 920, we have reviewed this matter for errors evident "by a mere inspection of the pleadings and proceedings and without inspection of the evidence." We find two errors requiring correction.
First, we observe that in imposing the sentence for the simple burglary conviction, the trial court did not specify whether the sentence was to be served with or without hard labor, only that it was to be served concurrently with that for attempted second degree murder, a hard labor sentence. Although the minutes of the proceeding indicate that the defendant was sentenced to five years "with the Louisiana Department of Corrections," it is well settled that when the minutes and the transcript conflict, the transcript prevails. See State v. Webster, 95-605 (La.App. 3 Cir. 11/2/95); 664 So.2d 624. As La.R.S. 14:62 describes the sentence for a simple burglary conviction as one that can be served with or without hard labor, we conclude that the imposition of the sentence without indication of whether it is to be served with or without hard labor, renders the sentence for simple burglary indeterminate. See La.Code Crim.P. art. 879; State v. Bullitts, 99-515 (La.App. 3 Cir. 11/3/99); 746 So.2d 260. Accordingly, we vacate the sentence imposed for the defendant's simple burglary conviction and remand the matter to the trial court for imposition of a determinate sentence.
Furthermore, we observe an error in the minutes of the October 28, 1999 hearing at which the defendant was sentenced for the attempted second degree murder conviction. The heading for the minutes notes the conviction as one for attempted first degree murder rather than attempted second degree murder. Thus, we remand for correction of the minutes in this regard.

Sufficiency of the Evidence
Both the defendant's counsel and the defendant allege in their respective briefs that the conviction is not supported by sufficient evidence. Counsel's brief questions whether there was sufficient evidence of the assailant's identity. The brief does so by attacking the State's case on five main points: identification of the assailant's voice, motive, the defendant's arm injury, and identification by DNA testing. In his pro se brief, the defendant questions whether the State demonstrated he possessed a specific intent to kill. We first consider whether the record establishes that the State presented sufficient evidence for a finding that the defendant was the assailant.
The sufficiency of the evidence standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires an appellate court to determine whether "the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Hobley, 98-2460, p. 33 (La.12/15/99); 752 So.2d 771, 790. A trier of fact is required to make credibility determinations "and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impose on the fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law." State v. Casey, 99-23, p. ___ (La.1/26/00); ___ So.2d ___, ___, 2000 WL 101212.
Attempt is defined at La.R.S. 14:27(A), which provides:
Any person who, having a specific intent to commit a crime, does or omits an act *370 for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
The elements of second degree murder are set forth in La.R.S. 14:30.1, in part, as follows:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2)(a) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, drive-by shooting, armed robbery, first degree robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.
With these requirements in mind, we turn to defense counsel's individual claims.

Identity
As stated above, the defendant's appellate counsel contends the evidence was insufficient, but does not specifically contest the evidence as a whole. Rather, counsel points to several issues he contends undercut the State's case. First, counsel contests Ms. Smith's testimony regarding identification of the assailant's voice. We have pointed out that Ms. Smith testified she immediately recognized the voice of the assailant as that of the defendant. She stated she had worked with the defendant for approximately one and one-half years and he had been friends with her husband. The defendant had visited in her home and was a guest in her van on several occasions. According to her testimony, Ms. Smith heard the assailant's voice on three separate occasions. Throughout the matter, she was unequivocal in her identification of the assailant's voice as that of the defendant.
Counsel argues that "[a]s Janet Smith told Officer Kenneth Pine that she only recognized the assailant's voice as his face was covered and she could only see his eyes, there can be no earthly reason why a voice identification line-up was not conducted." Counsel asserts that such a procedure could have established the defendant' s innocence. While such a tool may have been available during the investigation, there is no legal authority requiring its use. This argument is without merit.
Next, counsel argues that the State failed to establish motive for the defendant to attack Ms. Smith. As can be seen from La.R.S. 14:30.1 and La.R.S. 14:27, motive is not a required element of attempted second degree murder. However, the Louisiana Supreme Court has explained that absence of proof of a motive "may properly be considered as a circumstance mitigating against specific intent." State v. Williams, 93-2707, p. 4 (La.3/11/94); 633 So.2d 147, 149, quoting State v. Mart, 352 So.2d 678, 681 (La.1977). While several motives were suggested at trial and the jury was free to conclude that a motive was proven, we do not find that a demonstration of any such motive was required. However, the defendant separately argues the State failed to establish specific intent for the attempted second degree murder conviction, an argument we will address below.
Defense counsel also questions whether evidence regarding the defendant's whereabouts at the time of the attack renders the evidence insufficient for a conviction. The attack occurred at approximately 11:10 p.m. When first arrested by the police at 5:00 a.m. at friend Ferddie Flores' home, the defendant informed police that he had been at the house all night. However, the defendant changed his version of events after the police spoke with Flores and then confronted the defendant. *371 He then stated he had borrowed Flores' truck and left for a period of time to visit another friend, Cedric Washington. At trial, Wommack testified he returned by approximately 10:30 p.m. and woke Flores to inform him of his return. Wommack stated that, after he woke Flores, the two watched a movie, during which Flores fell asleep. Wommack stated that he woke Flores at 11:30 to ask him to take him home, but that Flores told him to stay, which he did.
Flores testified that the defendant borrowed his truck that night and would not answer questions about where he was going. Flores also testified that he fell asleep after the defendant left and, although he briefly awoke when the defendant returned, he went to bed and did not remember the time of the defendant's return. Cedric Washington confirmed that the defendant visited him that night. He stated, however, that he left by approximately 9:30 p.m. and did not return.
Karen Franklin Mayes, Flores' girlfriend at the time, testified she and her sister drove by Flores' house twice that evening. She stated that they passed by about 9:30 p.m. and again around 11:30 p.m. She testified that Flores' truck was not there either time. Her sister, who was driving the vehicle that evening, confirmed her recollection of the time.[1]
Although counsel argues that evidence of the defendant's whereabouts undercuts the State's case, we disagree. The State presented evidence that he left Flores' home in Flores' truck, he left Cedric Washington's home at 9:30, and returned sometime later that evening. Karen Mayes and her sister testified that they did not spot Flores' truck at his home at either 9:30 p.m. or at 11:30 p.m. Thus, if the jury chose to believe this evidence rather than Wommack's own account of the timing, it could have believed that he had not returned to Flores' home at the time of the attack. This type of credibility determination is within the province of the jury, and is not to be second-guessed on appellate review. State v. Kennerson, 96-1518 (La.App. 3d Cir. 5/7/97); 695 So.2d 1367.
Defendant's counsel next contests evidence presented by the State in an attempt to demonstrate that the mark found on Wommack's arm was a bite mark. Counsel points out that the defendant informed Officer Pine he injured his arm by running into bolts on the goal while playing basketball at friend Scotty McDade's home. He alleges that others at the game did not notice any problem with his arm as they were focusing on an ankle injury he sustained at the same time. Wommack also contests the expert testimony of Dr. Roger Downs, an oral-maxillofacial surgeon, and forensic pathologist, Dr. Terry Welke, identifying the wound as a bitemark. He contends that both experts indicated that such an identification carried an error rate and that a forensic odontologist would have greater expertise in bite identification.
Again, counsel contests credibility determinations made by the jury. The jury was asked to accept either Wommack's testimony that he injured his arm playing basketball or the expert testimony identifying the wound as a bite-mark. The jury was aware of the experts' qualifications and was also aware that each expert testified that their identification was subject to an error rate. This type of information may affect the weight a jury affords an expert's testimony, but does not necessarily affect whether the jury is entitled to rely on the *372 information. Rather, the jury was able to see photographs taken of the mark on the defendant's arm, consider expert testimony that was subject to cross-examination, consider Ms. Smith's testimony indicating that she bit the assailant, and compare this information with the defendant's testimony regarding the nature of the injury. In view of the type of credibility determination required by the jury in this regard, we see no error on review.
Next, defense counsel attacks the DNA evidence presented by the State and focuses on the reliability of the identification. The State's expert, Thomas Callaghan, an analyst with the Federal Bureau of Investigation, testified that Ms. Smith's blood had markers found in only one in 250,000 Caucasian individuals. The same markers were identified in the blood found in Wommack's shirt and on the skirt found in the van. None of the blood found on either Ms. Smith or Wommack was identified as being that of Wommack.
Defense counsel argues there was the possibility of cross-contamination on the clothing analyzed. This issue arose because trial testimony indicated that all of Ms. Smith's clothing was bagged together. However, there is no indication that the defendant's clothing and that of Ms. Smith ever came into contact, a fact not contested in the defendant's brief. Counsel also argues that the tests administered by the FBI were below acceptable standards. Counsel claims that at the time the DNA tests were performed, the FBI lab was not accredited, the DNA copying device was not cleaned the month prior to the test, and it had not been calibrated for five months prior to the tests. Thus, counsel argues the DNA samples should not have been relied upon by the jury.
Again, the issues raised with regard to the integrity of the DNA testing were issues presented to the jury. Callaghan clearly informed the jury that current DNA testing cannot exactly match one individual's blood to a blood stain. The jury also had information regarding the accreditation, or lack thereof, of the FBI lab at the time of the testing. However, Callaghan testified that the lab has always followed the guidelines of the American Society of Crime Laboratory Directors. He testified extensively regarding the maintenance and calibration of the DNA equipment as well as the testing equipment used in the calibration of the equipment. Counsel's assertions regarding the improper cleaning and calibration of the equipment are erroneous. Callaghan testified that the DNA copier should be cleaned every other month "or as needed," according to the applicable regulations. The copier used for the tests at issue was cleaned the month prior to the tests. Therefore, any assertion that the copier was not cleaned timely is erroneous. Furthermore, with regard to the calibration of the equipment, the DNA copier was calibrated periodically in several different regards. The item complained of by counsel that was calibrated more than five months prior to testing, was the calibration device, not the copier. According to Callaghan, the device is to be calibrated annually. Thus, the equipment was timely calibrated. In any event, the jury was made aware of any weaknesses in the testing methods through cross-examination. The jury was able to afford the weight it found appropriate to the testimony.
In closing the sufficiency argument, appellate counsel asserts that the State failed to carry its burden as there was no eyewitness identification and no voice recognition line-up was held. Counsel argues "[t]hus, the State failed to present sufficient evidence to negate any reasonable probability of misidentification of David Wommack's [sic] as Janet Smith's assailant." The record indicates otherwise.
As discussed above, Ms. Smith testified that she recognized the voice of the assailant as that of Wommack, whom she had known for a considerable period of time. She consistently reported that the voice belonged to Wommack, beginning immediately *373 after the attack with her statements to Kitty Wingate and Detective Pine and testifying to the same at trial. Ms. Smith also testified that she saw the assailant briefly during the attack. She affirmed that the assailant's size and build were consistent with those of the defendant. Next, the jury was made aware that Ms. Smith informed Detective Pine that when they located Wommack, he would have a bite-mark on his left arm. A mark was found on Wommack's left arm when he was arrested several hours later. The mark was identified by experts as a bite-mark, photos of which the jury was able to view. The State also produced witness testimony indicating the defendant was not at Flores' house at the approximate time of the attack and in contradiction to his statements regarding his whereabouts at the time of the attack. Finally, as explained by Callaghan, the DNA evidence was consistent with Ms. Smith's blood. The DNA markers were found on blood on both Wommack's shirt and the skirt left in the van. We conclude that this evidence satisfies the State's burden of proving the defendant's identity as the assailant beyond a reasonable doubt.

Specific Intent
In his pro se brief, the defendant argues that the State failed to demonstrate that he had the specific intent to kill Ms. Smith. He points to other reported cases where specific intent to kill has been found. He contends that the facts of this case when compared to those of the reported cases indicate that intent to kill was not established. The defendant then cites several aggravated battery cases. He asserts that the facts of these cases are "much worse" than those of the instant matter and establish that the evidence was insufficient for an attempted second degree murder conviction.
La.R.S. 14:10(1) defines specific intent as follows:
Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.
Specific intent may be inferred from the circumstances of the event and defendant's actions. State v. Clark, 93-1470 (La.App. 3 Cir. 10/5/94); 643 So.2d 463, writ denied, 94-2715 (La.2/9/95); 649 So.2d 418.
Considering the circumstances of this case, we find sufficient evidence to support a finding of specific intent to kill. Ms. Smith testified that the assailant grabbed her by the throat, making it impossible to breathe. It was only after she continued to struggle that she was able to breathe and speak. The struggle, which included Ms. Smith being placed in a chokehold, lasted long enough for several verbal exchanges and was severe enough to have caused blood-producing injuries. The pressure was sufficient to produce bruising on Ms. Smith's neck which is evident in photos presented to the jury. Furthermore, Ms. Smith's testimony indicated that the assailant verbalized his intent to kill her. These factors support the jury's conclusion that the defendant's intent was to kill or inflict great bodily harm. See La.R.S. 14:30.1. Furthermore, the jury reached its decision in the face of the possibility of convicting the defendant of aggravated battery, the elements of which were included in the instruction. This assignment lacks merit.

Expert Testimony
Both counsel and the defendant attack the testimony of State experts, Dr. Roger Downs and Dr. Terry Welke. Dr. Downs, an oral-maxillofacial surgeon, and Dr. Welke, a forensic pathologist and jail physician, both identified the wound on Wommack's arm as a human bite-mark. Before accepting the testimony of the experts, the trial court conducted a hearing pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
*374 Commenting on Daubert and its applicability in Louisiana cases, a panel of this court has explained:
In Daubert, the Supreme Court suggested that the trial court should consider four factors in determining whether expert scientific evidence is reliable: (1) whether the theory or technique can be, and has been, tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error of the theory or technique; and (4) whether the theory or technique is generally accepted in the scientific community....
Because La.Code Evid. art. 702 is identical to Rule 702 of the Federal Rules of Evidence, the Louisiana Supreme Court adopted the Daubert test as the test to be applied in Louisiana. See State v. Foret, 628 So.2d 1116 (La. 1993).
State v. Schmidt, 97-249, p. 9 (La.App. 3 Cir. 7/29/97); 699 So.2d 448, 453, writ denied, 97-2220 (La.12/19/97); 706 So.2d 451.
Counsel's brief is unclear regarding what legal standard should apply to this assignment. The defendant's pro se brief cites State v. Quatrevingt, 93-1644 (La.2/28/96); 670 So.2d 197, cert. denied, 519 U.S. 927, 117 S.Ct. 294, 136 L.Ed.2d 213 (1996), which followed the standards set forth in Daubert and Foret. The State's brief relies upon La.Code Evid. art. 702, which states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The previous quote from Schmidt demonstrates that Article 702 and Daubert are not mutually exclusive.
Although the trial court considered the expert testimony in a separate hearing, the Daubert standards do not appear to be readily applicable to the present case. Neither expert used complex testing in identifying the wound found on Wommack's arm. In simplest terms, Dr. Downs made his determinations after inspecting the wound within days of the offense and Dr. Welke reached his opinion after looking at pictures of it. Expert opinion testimony based upon personal observation and experience is admissible. State v. Howard, 93-74 (La.App. 3 Cir. 11/2/94); 649 So.2d 489, writ denied, 94-2944 (La.3/17/95); 651 So.2d 266.[2] Dr. Downs' testimony at the Daubert hearing revealed his significant background in various aspects of dentistry and oral surgery. Insofar as forensic experience, the following colloquy between the State and Dr. Downs demonstrates his expertise in the area:
Q What kind of experience have you had over the years in looking at what I'm calling bite-mark-wound-type injuries?
A Well, it wasn't very extensive except in body identification and in investigations by the CID of the Army in certain murder cases.
Q So you have been consulted in the past about this type injury?
A Yes, sir.
Q Have you ever expressed opinions about it to law enforcement personnel?
A Yes, sir.
Q Have you ever been called as an expert witness anywhere to testify about, again, what I'm calling bite-mark evidence?
A In the three cases that I can recall off the top of my head, theit seemed to have been dropped. In other words, *375 I was never brought back into a court to testify for that; no.
Q So the cases were disposed of in some fashion other than a trial?
A Yes, sir.
Q So this would be your opportunity your first opportunity to actually go forward and qualify as an expert in a court of law?
A For this type; yes, sir. I have done it for body identifications in airplane crashes. But in criminal cases, it's mainly just identification of body for the continuing of the investigation [sic]. Mainly, just personal identification of the body.
THE COURT:
Excuse me. Let me interrupt just a moment. The type of evidence you were viewing at that time, I assume, was matching the remains, dental remains, of a person against prior records of their particular bite; is that right?
THE WITNESS:
Yes, sir.
THE COURT:
That did not involve any bite-type wounds or anything of that sort, then, would it?
THE WITNESS:
That's right, sir.
THE COURT:
But on three occasions, you didyou were consulted by law enforcement officials pertaining to bite marks on victims; is that correct?
THE WITNESS:
Yes, sir.
THE COURT:
Thank you.
Q (Mr. Morton) And do you have anyIn all the course of your training your dental school, your undergraduate work, your graduate workis bite markhuman bites, is that something ever discussed or talked about in all of your education?
A Yes, sir.
Q Is it something you feel that you're familiar with?
A Yes, sir, as well as any other of my contemporaries. I'm talking aboutAn oral surgeon in the Army, you are given refresher courses in cursory forensic, first of all, as the Judge said, in identifying remains, but also to try to distinguish between human versus other animal or other injuries. To narrow it down to a specific human being, well, that depends on the case; but they did give us cursory information on how to do that. In a fresh wound. In a fresh wound.
Also, Dr. Downs estimated that his rate of error for visual identification of the wound would be less than 10 percent. He acknowledged that specific identification of the wound as matching the victim's dental pattern was beyond his expertise.
After conducting an extensive Daubert hearing, the trial court concluded that Dr. Downs had sufficient experience and training to identify Wommack's wound as a human bite-mark. The court further ruled that Dr. Downs would not be allowed to testify regarding the age of the mark, or to identify it as matching the victim's dental pattern. In view of Dr. Downs' extensive experience, we conclude that the lower court did not abuse its discretion in accepting him as an expert.
The other expert who testified about the bite, Dr. Welke, did not personally examine the defendant. Rather, he viewed photographs of the wound the week prior to trial. At the Daubert hearing, Dr. Welke testified that he had no special training in bite-mark identification and had never given testimony on the subject. Although he works as a forensic pathologist, Dr. Welke is not board certified. He noted that along with being the coroner for Calcasieu Parish, he is the jail physician. Dr. Welke stated that he has seen human bite-marks and is familiar with their appearance. He sees bite-marks from jail fights once or twice per year. He reviewed *376 the photographs of Wommack's wound and formed the opinion that it resulted from a human bite. Dr. Welke testified that he could testify whether or not the wound was consistent with a human bite. On cross-examination, he estimated his error rate would be approximately forty-nine percent. He used the same figure at trial, but on redirect placed the error rate closer to ten percent.
Considering the transcript of the hearing, we do not find that the lower court abused its discretion in accepting Dr. Welke as an expert. Further, even if Dr. Welke's testimony regarding Wommack's wound should have been excluded, we find any such error harmless. As discussed above, Dr. Downs, an oral-maxillofacial surgeon, presented strong credentials and testified the wound was a human bite-mark. The jury was also presented with numerous photographs of the wound found on the defendant's arm.
These assignments have no merit.

Sequestration
In defense counsel's third assignment, he argues that one of the State's witnesses should not have been allowed to testify because of an alleged violation of the court's sequestration order. Karen Mayes, who was Ferddie Flores' girlfriend at the time of the offense, testified that she and her sister drove by Flores' house twice on the night of the crime. Both times, at 9:30 p.m. and 11:30 p.m., her boyfriend's truck was not there.
At the beginning of cross-examination, defense counsel learned that Mayes had spoken with Ms. Carol Drost, the district attorney's victim assistance coordinator, on the morning before trial began. Apparently, Mayes also looked over her statement. Defense counsel approached the bench, and suggested Mayes may have inadvertently violated the court's sequestration order. The court excused the jury and held a hearing on the matter. At the close of the hearing, the court ruled that Mayes' testimony should not be stricken:
Very well. At this time the Court's going to deny the motion to strike. It is apparent, first of all, that she had no conversationthe witness had no conversation with Ms. Drost after the rule of sequestration was invoked, which was a few minutes after 9:00 this morning. Secondly, if she had, it does not appear that there was any discussion of the subject matter of her testimony but merely as to the way testimony may be presented.
Witness sequestration is governed by La.Code Evid. art. 615, which, at the time of trial, stated in pertinent part:
A. As a matter of right; exceptions. On its own motion the court may, and on request of a party the court shall, order that the witnesses be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case. In the interests of justice, the court may exempt any witness from its order of exclusion....
B. Violation of exclusion order. A court may impose appropriate sanctions for violations of its exclusion order including contempt, appropriate instructions to the jury, or when such sanctions are insufficient, disqualification of the witness.
As can be seen from reference to Article 615, the trial court has discretion to impose sanctions for a sequestration violation. Here, the trial court conducted a hearing, concluded that no conversation occurred prior to the order of sequestration and further concluded that any such conversation did not relate to the subject matter of the witness' testimony. Thus, we find no abuse of discretion in the trial court's determination that sanctions were not appropriate.

Excessiveness of the Sentence
Both counsel and the defendant argue that the twenty-one-year sentence for attempted second degree *377 murder is excessive. Counsel's brief mistakenly argues that trial counsel filed no motion to reconsider the sentence, and suggests remand. However, the State's brief points out that trial counsel filed a Motion to Reduce Sentence; the court denied the motion. The motion argued that the sentence imposed was "grossly out of proportion to the crime committed." We conclude this argument was sufficient to preserve the Defendant's excessiveness claim for appellate review. See La.Code Crim.P. arts. 881.1 and 881.2(A).
The standard of review for excessive sentence claims was recently set forth in State v. Jones, 99-122, p. 4-5 (La.App. 3 Cir. 6/23/99); 742 So.2d 597, 600:
A sentence is unconstitutionally excessive if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it is so disproportionate as to shock one's sense of justice. The trial judge has wide discretion in the imposition of sentence within the statutory limits and such a sentence should not be set aside as excessive absent a manifest abuse of discretion. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.
(Citations omitted.) See also State v. Cook, 95-2784 (La.5/31/96); 674 So.2d 957, cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).
After receipt of a pre-sentence investigation report, the trial court held a sentencing hearing on October 14, 1999, at which time testimony was offered by witnesses for both the State and the defendant. On October 28, the court reconvened and, in listing reasons for the sentence, explained:
The victim, Janet Doyle Smith, testified at the hearing and told the Court how she and her children have lived in fear ever since the incident and how she has been afraid to go anyplace at night. Her mother, Mrs. Doyle, also testified to the affects [sic] your action has had on her daughter and grandchildren. Your mother, Jan Deaton, testified on your behalf; and the Court received many letters from friends, relatives, and co-employees with whom you have worked since being out of jail on bond.
Your friends, relatives, and co-employees share a belief that you are not capable of the offense which you committed and that it was totally out of character for you. Your former wife, Melinda Little, testified at length and painted a totally different portrait of you. She testified that you physically abused her by hitting her on almost a daily basis. And on two occasions, had chocked [sic] her. Once choking or attempting to strangle her with an electrical cord. As Judge, I found her testimony to be very credible.
Suspension of sentence is not an option in this case under the law. However, the Court has considered the sentencing guidelines set forth in Code of Criminal Procedure, Article 894.1 in determining the appropriate sentence that you should serve. To your credit, you have no prior criminal history. You are gainfully employed, and you have the support of your family, friends, and co-employees.
On the other hand, the Court is convinced that on the night of January 13th, 1997, you carried out a cold and calculated plan to murder Janet Doyle Smith with your bare hands. She saved herself only by her own strength, determination, and will to live. Any provocation by her was so slight that it should not be considered as a factor in this sentencing.
There had, of course, been no showing of remorse and you have continually denied your involvement and have never *378 accepted any responsibility for what was so clearly your attempt on Mrs. Smith's life. As recently as yesterday, I received a six-page letter from you extolling your virtues and wherein you stated, "I could never formally apologize to her, but in another sense I have nothing to apologize for because, Your Honor, I'm innocent."
As stated earlier, I simply do not believe you. In view of the lack of provocation in this case and in view of your apparent violent nature as testified to by your ex-wife and as demonstrated in your attempt to murder Janet Doyle Smith, the Court cannot discount the probability of a reoccurrence of violent criminal conduct by you if you are not incarcerated for a substantial period of time.
I have pondered this sentence for many hours and have concluded neither the maximum sentence of 50 years nor the minimum sentence of 10 years is appropriate in this case. A maximum sentence should not be imposed since you have no criminal history. A minimum sentence would deprecate the seriousness of the offense. Your lack of acceptance of responsibility and lack of remorseand I say that in spite of what Mr. Wallace has stated today because I received a letter from you yesterday saying that you were totally innocent. I would repeat, your lack of acceptance of responsibility and lack of remorse convinces the Court that a sentence substantially greater than the minimum provided by law should be imposed.
Accordingly, it is the sentence of this Court that you serve 21 years with the Department of Corrections without benefit of parole, probation, or suspension of sentence subject to credit for time served prior to the imposition of this sentence. You are further advised that pursuant to the provision of Louisiana Code of Criminal Procedure, Article 930.8, you must file application for post-conviction relief within two years after the judgement of conviction of sentence has become final under the applicable provisions of the law or the right to do so may be lost to you. And that will be the sentence of the Court.
Our review of the circumstances of this case reveal no abuse of discretion in the trial court's reasoning and imposition of sentence. Here, the defendant was faced with the possibility of a fifty-year sentence to be served at hard labor. A sentence of almost half this exposure, twenty-one years, was imposed after the trial court heard evidence indicating that the defendant attempted to strangle Ms. Smith, making it impossible for her to breathe, and fought violently enough to produce blood and bruising. The court was also aware that Ms. Smith's aggressive struggling may have been the only thing preventing her death.
Wommack also complains that his ex-wife's testimony at the sentencing hearing was "incredible" and should not have been relied on by the trial court. Credibility determinations made by the sentencing court will not be disturbed on appeal, absent manifest error or abuse of discretion. State v. Williams, 95-1556 (La.App. 3 Cir. 2/19/97); 688 So.2d 1343. The defendant makes no showing of manifest error or abuse of discretion, thus this argument fails.
For the reasons discussed, these assignments lack merit.

Right to Confront Witnesses
The defendant claims his federal Constitutional right to confront a witness was violated. As defense counsel conducted his cross-examination of the victim, the State objected to questions regarding problems she had with her husband, Dennis Smith.[3] Although the pro se brief does not cite the passage the assignment is *379 based on, review indicates that the following colloquy is that at issue:
Q So as I understand your answer, you don't know of anything that you either said to your husband or your husband said that David Wommack heard and somehow may haveThat was something you were conjecturing about?
A That's right.
Q You were guessing about at that time?
A Yes, I was.
Q You were looking for a reason why this man might have attacked you?
A Yes. I didn't know why.
Q Didn't make any sense to you, did it?
A Well, I knew he was angry; but I didn't know he was that angry.
Q Were you involved in an extramarital affair during this period of time, Ms. Smith?
A No, I was not.
Q That wasn't part of the problem between you and your husband?
A No. That was hison his side, his part.
Q Do you know a person by the name of John Neal, II?
A Yes, I do.
Q Is he a friend of yours?
A I've known him since, I think, I was 21.
Q Do you have a relationship with him now?
A We have a friendly relationship.
MR. MORTON:
Objection, Your Honor. Could we approach?
THE COURT:
You may.
(CONFERENCE AT SIDEBAR:)
THE COURT:
State your objection.
MR. MORTON:
Your Honor, I object on the grounds of relevance. This has absolutely no relevance to
THE COURT:
What is the relevance of this, Mr. Wallace?
MR. WALLACE:
Information I had that she may have been having a relationship with him at that time.
MR. MORTON:
What's that got to do with anything?
THE COURT:
What relevance would that have to this case?
MR. WALLACE:
Judge, she told the police officers that she gave the motive of her husband having a relationship with another woman and somehow he's made comments. I was just trying to explore to see if perhaps she was having a relationship of her own.
THE COURT:
Even if she was, I don't see the relevance.
MR. WALLACE:
All right.
This issue arose because the victim had suggested to the police that Wommack may have attacked her after misunderstanding something her husband had said. Thus, the attack would have grown out of the defendant's loyalty to the victim's husband.
The defendant's line of questioning delved into a theory that Dennis Smith was somehow involved in the attempted murder of the victim. A similar scenario was present in State v. Hattaway, 28,060, p. 12-13 (La.App. 2 Cir. 5/8/96); 674 So.2d 380, 389-90, writ denied, 96-1900 (La.1/10/97); 685 So.2d 141:
By this assignment, Hattaway contends the trial court erred in not allowing him to question Raymond Heck on cross examination about the victim, Slade's, marriage. Specifically, defense *380 counsel asked if Heck knew whether or not Slade had marital problems. The state's objection on relevancy grounds was sustained. On appeal, Hattaway argues that this denied him his constitutional right to confront witnesses under the Sixth Amendment and La. Const. art. 1, § 16.
Cross examination, the primary means by which the believability and truthfulness of a witness are tested, is the essential purpose of confrontation. Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); State v. Mosby, 595 So.2d 1135 (La. 1992); State v. Hillard, 398 So.2d 1057 (La.1981), [after remand, 421 So.2d 220 (La.1982)]. However, its scope is not without limit. For evidence to be admissible, it must be relevant. Relevant evidence is that:
having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
La.C.E. art. 401.
The trial court has discretion to determine relevancy, and thus the scope and extent of cross examination. State v. Lard, 568 So.2d 629 (La.App. 2d Cir. 1990). Its decision will not be disturbed absent an abuse of that discretion. Id.

By questioning Heck about disharmony in Slade's marriage, defense counsel sought to demonstrate that Slade's wife had a motive to kill him. However, it is too tenuous to infer from the mere fact of marital problems that Mrs. Slade had a motive to kill her husband. Most importantly, there was no evidence at all to support the theory of marital discord, although such could easily have been presented by calling Mrs. Slade herself. In the absence of evidence of marital discord, the trial court did not abuse its discretion in limiting the cross examination of Heck. Cf. State v. Van Winkle, 94-0947 (La.6/30/95), 658 So.2d 198.
The record in the instant matter reveals a similar situation. The Smiths' marital problems were put before the jury, but no facts indicated that Dennis Smith had any involvement in the attack. Defense counsel's own questions revealed the irrelevance of any further probing. Before Ms. Smith took the stand, the defense cross-examined Detective Pine about the husband's possible involvement. Detective Pine replied that his investigation revealed no evidence pointing to Dennis Smith's involvement. Detective Ricky Johnson made the same observation. Under cross-examination, Ms. Smith stated she did not believe her husband instructed Wommack to hurt her. She explained that during the investigation, she had been guessing as to any possible motive by the defendant. She did not know why he had attacked her.
Although the defendant's questions were curtailed, counsel was allowed to explore the facts surrounding the Smiths' marital difficulties. These included allegations of Dennis Smith's extramarital affair with one of the restaurant personnel. The court cut off the line of questioning when it began to veer into whether Ms. Smith had been involved in such an affair, finding such testimony irrelevant. Our review reveals no error in the trial court's determination.

Ineffective Assistance of Counsel
In his fifth error assigned pro se, the defendant contends that his trial counsel was ineffective. Specifically, he claims that counsel had a "glaring conflict of interest" because he knew the victim. He also argues that counsel failed to call a previously-retained DNA expert, for unknown reasons.
Regarding the conflict of interest claim, the following colloquy took place at the beginning of defense counsel's cross-examination of the Ms. Smith:
EXAMINATION BY MR. WALLACE:

*381 Q Ms. Smith, before we begin, I just want to tell youYou and I have known each other for a long time, and I want to tell you that I'm going to apologize in advance to you for anything that I may ask you that's going to cause you any grief or pain today. Because I understand this is always a traumatic experience after something like this has happened. So, with that, like I say, I apologize in advance.
When did you first meet Mr. Wommack?
The standard for appellate evaluation of ineffectiveness claims was set out in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), rehearing denied, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984). In Strickland, the Supreme Court held that a defendant must show that: (1) his counsel's performance was deficient, and (2) his counsel's deficiency prejudiced the outcome of the trial. Strickland, 466 U.S. 668, 104 S.Ct. 2052. Although such claims are usually deferred to the post-conviction process, the defendant correctly points out that ineffectiveness claims may be addressed on appeal, if the record is sufficient to make a determination regarding the claim. See State v. Velez, 588 So.2d 116 (La.App. 3 Cir.1991), writ denied, 592 So.2d 408 (La.1992), cert. denied, 505 U.S. 1220, 112 S.Ct. 3031, 120 L.Ed.2d 901 (1992). However, we conclude that the present claim should be deferred to the post-conviction process for two reasons.
First, Wommack's argument concedes that his trial counsel "did a good job and as a general view, [Defendant] was pleased with Counsel Trial performance [sic]." These cases indicate that when the conflict is raised post-trial, a defendant must show that an actual conflict existed which placed counsel "in a situation inherently conducive to divided loyalties." State v. Kahey, 436 So.2d 475, 484 (La. 1983). If a defendant shows such a conflict, then he or she need not demonstrate specific prejudice. However, an appellate court will not presume that such conflict existed at trial. A defendant must show that his trial counsel owed a duty to some other party "whose interests are adverse to those of the defendant." Id. Here, Wommack has failed to show that his trial counsel owed any duty to the victim. The relationship between defense counsel and Ms. Smith is not set forth in detail in the record, only that the two were acquainted. Thus, we conclude that the issue should be deferred to the post-conviction process, where the record may be developed more fully.
Second, regarding the defendant's claim regarding his DNA expert, we note that the defendant's argument concedes the matter would be better-addressed in the post-conviction process. As there is no evidence in the record regarding retention of such an expert or any evidence regarding the defendant's claim that defense counsel may have erred in failing to call the witness, we agree that this issue would also be better addressed by post-conviction relief.

DECREE
For the foregoing reasons, the convictions of the defendant, David Wommack, are affirmed. The defendant's sentence for attempted second degree murder is also affirmed. However, the defendant's sentence for simple burglary is vacated and the matter remanded for resentencing in accord with this opinion. On remand, the trial court is further instructed to correct the minutes of October 28, 1999 to indicate that the defendant was convicted of attempted second degree murder rather than attempted first degree murder.
AFFIRMED IN PART; VACATED IN PART AND REMANDED.
NOTES
[1] Defense counsel argues that the sisters' testimony should not have been considered at trial due to an alleged sequestration violation. Although this issue was assigned separately, and will be discussed below, counsel also addresses the matter in the sufficiency assignment. However, such an allegation is improper in a sufficiency review. See State v. Hearold, 603 So.2d 731 (La.1992) wherein the Louisiana Supreme Court held that a sufficiency review includes review of all evidence presented to the jury, whether properly admissible or inadmissible.
[2] In Howard, this court approved testimony by a deputy as an expert. The deputy testified regarding the distance from a victim that a gun was fired, based upon his personal observation of powder burns on the victim's body. The witness had twelve years of experience in law enforcement, with classes and seminars regarding gunshot wounds and powder burns.
[3] At the time of sentencing, the Smiths' divorce was pending.