# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 22-786

STATE OF LOUISIANA

VERSUS

JAMES SANFORD SNIDER

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2725-21
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## GUY E. BRADBERRY
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Candyce G. Perret, Guy E. Bradberry, and Wilbur L. Stiles, Judges.

**CONVICTION AFFIRMED; SENTENCE AFFIRMED, AS AMENDED; REMANDED WITH INSTRUCTIONS.**

**Holli Ann Herrle-Castillo**
**Louisiana Appellate Project**
**P.O. Box 2333**
**Marrero, LA 70073**
**(504) 345-2801**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **James Sanford Snider**

**Stephen C. Dwight**
**Fourteenth Judicial District Court**
**District Attorney**
**Karen C. McLellan**
**Assistant District Attorney**
**901 Lakeshore Dr., Suite 800**
**Lake Charles, LA 70601**
**(337) 437-3400**
**COUNSEL FOR:**
    **State of Louisiana**

**BRADBERRY, Judge.**

On January 21, 2021, Defendant, James Sanford Snider, was charged by bill of indictment with the second degree murder of Mr. Jon Tallon Lee, in violation of La.R.S. 14:30.1; as well as one count of possession of a firearm by a convicted felon, in violation of La.R.S. 14:95.1. Defendant pled not guilty on February 22, 2021; he subsequently modified his plea to not guilty and not guilty by reason of insanity on July 13, 2021.

On March 4, 2022, a jury found Defendant guilty as charged on both counts. On March 17, 2022, Defendant was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence for his second degree murder conviction and twenty years at hard labor without benefit of probation, parole, or suspension of sentence for his possession of a firearm by a convicted felon charge. The sentences were ordered to run concurrently and the court imposed a suspended $1000 fine. A "Motion for Reconsideration of Sentence with Incorporated Memorandum" was filed on Defendant's behalf on April 11, 2022, asserting his maximum sentence for possession of a firearm by a convicted felon was excessive; the trial court denied the motion without hearing the same day.

Defendant now appeals his convictions asserting a single assignment of error, that there was insufficient evidence to support his convictions. Specifically, Defendant contends he "established by a preponderance of the evidence that [Defendant] did not know his actions were wrong at the time he shot John [sic] Lee." For the reasons discussed below, we affirm Defendant's convictions and sentences.

**FACTS**

On September 24, 2020, Defendant shot Mr. Jon Tallon Lee once in the chest with a .38 caliber revolver, killing Mr. Lee. While Defendant does not contest that he illegally possessed the revolver and killed Mr. Lee with it, he contends he was not guilty by reason of insanity. Accordingly, we will review the evidence which was relevant to the determination of Defendant's sanity.

Officer Houston Boyt of the Lake Charles Police Department testified he was one of the first two officers to arrive at the scene of the shooting on Fourteenth Street. He noted Defendant approached with a revolver in his hands when law enforcement arrived, but complied with commands and laid the revolver down on a log so that Officer Boyt could handcuff and detain him. Officer Boyt noted the revolver contained one spent casing and five unfired rounds. According to Officer Boyt's bodycam, Defendant immediately put the gun down then approached officers claiming, "that man had me on my knees with a machete," and repeatedly claiming he had been abused. In the bodycam video, Defendant told Officer Boyt the shooting was "first degree, with intent."

The State also presented a twenty-two second video of the actual shooting, filmed by Joseph Doucett, Jr., who referred to the victim as his "Uncle Jon" and who testified his uncle had asked him to record the interaction with Defendant, who was Jon's uncle. In the video, the victim is standing by his car while Defendant is standing in front of him holding a gun in his right hand. He pokes the victim in the chest, causing the victim to yell "UNC"! Defendant then shoots the victim at point blank range once in the chest before walking away and yelling "He beat the shit out of me" at Mr. Doucett.

While Defendant did not testify at trial, the statement he gave to law enforcement on the day of the murder was played for the jury as State's Exhibit 10. Defendant was trying to fill out the *Miranda* form faster than officers could read it, stating "You have the right to remain silent, HELL NO." Defendant asked officers for the "law book" so he could look up "intent," claiming he was "screwed a long time ago" and stating he wanted the death penalty. Defendant explicitly stated that he tried to get the victim to pull a weapon on him so he could disarm him then kill him. Defendant claimed he had been trying to get law enforcement or child protective services to get the victim away from "Claire" and her daughters.

Defendant stated he wished the victim had come alone but noted that he "liked Junior," so he just left him alone. He also said he had been wanting to kill the victim for about two years, but stated he had nowhere else to go. According to Defendant, after he acquired the gun, he was walking to where he met the victim and told a small group of young men that they should leave, then he saw the victim arriving. He then appeared to indicate that he showed the young men the gun when he told them to leave. After stating he shot Jon once and figured "that's enough, let him choke," Defendant claimed he shot him in the chest "with intent." He further clarified he shot Jon in the chest because he did not want any of the lead from the bullet to fly out and hit anyone else. Defendant claimed he told the arresting officer that he would like to plead to "death row." According to Defendant, he "just wanted to kill that animal. And [he] enjoyed the shit out of it."

Defendant again stated he wished "Sticker" had been with the victim so he could have killed him too. Other testimony established that "Sticker" was Bobby Ray Treaster, another individual who was living at the house with Defendant and the victim. Defendant stated he killed the victim because he lied during the

3

confrontation, claiming he would have shot him in the leg and "stomped on him" if he had told the truth. He also asserted that he could have easily beaten the victim without using a gun. Defendant was then adamant that he was going to kill the victim. Defendant lamented not bringing some Jameson to celebrate, telling officers to sign him up for death row because he "enjoyed that."

The State's final witness was Dr. Patrick Hayes, whom the court accepted as an expert in the field of psychiatric medicine. Dr. Hayes testified Defendant knew what he was doing at the time of the shooting: "If you yell the word die before you pull a trigger and kill somebody, you know who you are; you know who they are; you know what that action's going to do." He called Defendant's actions after the shooting logical and coherent. He distinguished Defendant's behavior from what he considered true psychosis:

> So tru[e] lunacy, true bipolarity, true thought disorders, true psychosis, you don't see that kind of stuff. You actually see odd things. You see things that don't make sense. You see people wandering around agitated; you see people wandering around confused, not simply angry.

> So in this instance, you see that. And then in audio as he's walking away to, I believe it was Junior in the car, the first part of that statement we weren't ever able to piece out; but the second part of it was he's been beating the shit out of me or words to that affect [sic].

> So again, back to that contextually appropriate to this bad decision, logical, goal-directed, coherent, consistent decision, he told Junior why he did it.

Dr. Hayes noted that he believed Defendant's references to "intent" and "first degree murder" were part of an "overarching legal strategy," noting Defendant told him he would get better housing and a better defense if he was charged with first degree murder rather than second degree. Dr. Hayes testified "Mr. Snider does not have a serious persistent mental illness. There's some

4

wandering diagnosis in the records." He also noted Defendant's self-reported lengthy history of drug use. Dr. Hayes also noted Defendant had diagnoses of "bipolar unspecified," "major depressive disorder," and "unipolar depression" in the years leading up to the shooting. He noted there were also a couple diagnoses of PTSD (Post-traumatic stress disorder). According to Dr. Hayes, Defendant's primary issue is some sort of social personality disorder, noting it is "volitional, maladaptive, bad choices, that are long-standing and ingrained and engross essentially everything you do."

In summary, Dr. Hayes did not believe Defendant met the legal standard for insanity:

> Mr. Snider knows who he is. Mr. Snider knows who James Lee was. Mr. Snider knew what was going on leading up to that. Mr. Snider called his shots literally. Said what he was going to do or said what the action of what he was going to do. He did it, and that's what happened.
>
> And then consistent with his theme across the board, he told Junior Doucett exactly why he did it; and that has not changed in the records antecedent to the shooting, the statements at the time of the shooting, or what he told me a year-and-a-half later.

Regarding Defendant's counselor Molly Larson and his psychiatric nurse practitioner Ms. Sarah Cooling, Dr. Hayes noted Defendant had not seen either of them for roughly a year before the shooting. Following Dr. Hayes's testimony, the State published its evidence to the jury and rested its case.

Defendant's first witness was Mr. James Victorian, who testified he had known Defendant for about twelve or thirteen years and lived next door to Defendant when Defendant lived on Fourteenth Street. According to Mr. Victorian, he saw Defendant on the day of the shooting and noticed Defendant "just really looked distraught; and I haven't seen him like that ever before." Mr.

5

Victorian testified the victim was repeatedly calling Defendant, who was ignoring most of the calls and stated he advised Defendant to "[j]ust stay away" from the person bothering him.

Defendant then called Ms. Molly Larson, Defendant's former counselor. Ms. Larson testified she treated Defendant from November of 2017 until September of 2019. She stated Defendant was referred to her by Ms. Sarah Cooling, a nurse practitioner in the same office, and that he had been diagnosed with bipolar disorder, PTSD, and generalized anxiety disorder. Ms. Larson testified that while Defendant seemed mostly compliant with therapy during the two years he was her patient, he was not discharged from therapy when he stopped seeing her in 2019.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there is one error patent involving the sentences imposed. Specifically, we find there is an error patent as to the trial court's statement regarding diminution of sentence.

After imposing the sentences, the trial court stated the following:

> At this time, as far as the Court is concerned, under 15:571.3, the Defendant will not be eligible for any diminution inasmuch as the life sentence is without benefit. It may - - something may occur with regard to the offense of possession of a weapon by one convicted of certain felonies.

There is no mention of diminution of sentence in either the minutes or the Uniform Commitment Order.

This court has stated the following regarding the trial court's authority to deny diminution of sentence:

We first address whether the trial court "denied" diminution of sentence. Such a denial by the trial court would constitute error as the supreme court has held that the provisions of La.R.S. 15:537(A), which prohibits diminution of sentence for certain sex offenders, and the provisions of La.R.S. 15:571.3, which sets forth the guidelines for diminution of sentence for all prisoners, do not form part of the sentence. *State v. Prejean*, 08-1192 (La. 2/6/09), 999 So.2d 1135 (per curiam). The guidelines are instead directives to the Department of Corrections in computing an inmate's sentence. *Id. See also State v. Fallon*, 15-1116, p. 4 (La.App. 3 Cir. 4/6/16), 189 So.3d 605. Both the supreme court and this court have repeatedly stated that trial judges lack authority to deny diminution of sentence. *See State v. Narcisse*, 97-3161 (La. 6/26/98), 714 So.2d 698; *Fallon*, 189 So.3d 605. In cases in which the trial court has been found to deny diminution [of] sentence, this court has corrected the sentencing error. *See, e.g., State v. Davis*, 19-562 (La.App. 3 Cir 2/5/20), 291 So.3d 246, *writ granted on other grounds*, 20-392 (La. 6/3/20), 296 So.3d 1041; *Fallon*, 189 So.3d 605.

*State v. Monceaux*, 22-28, p. 6 (La.App. 3 Cir. 6/1/22), 340 So.3d 201, 206.

In *Monceaux*, this court found the trial court's statement regarding good time was merely an advisement that did not need correction. The trial court in *Monceaux* stated the following at sentencing:

> Under 15:571.3, is the defendant subject to diminution for good behavior[?]
>
> It's the Court's position he is not.

*Id.* at 206 (alteration in original).

In *State v. Broussard*, 22-507 (La.App. 3 Cir. 11/30/22), 354 So.3d 167, this court discussed cases where we found the trial court statement's regarding diminution of sentences were merely advisements and cases where this court found the trial courts' statements were improper denials of diminution of sentence. This court went on to distinguish *Monceaux* and found defendant's sentence needed correction. In *Broussard*, the trial court stated the following at sentencing:

> Your sentence is not entitled to diminution for good behavior, under the provisions of [La.R.S.] 15:537, because you stand convicted of a violation of Subpart

7

> A(1) of Part 5 of Title 1 of - - I'm sorry - - of Chapter 1
> of Title 14 - - namely, molestation of a juvenile.

*Broussard*, 354 So.3d at 168.

In the present case, we find the trial court's statement is an actual denial of diminution of sentence. Defendant's sentence for second degree murder is amended to delete the trial court's statement regarding diminution eligibility, and the trial court is instructed to make an entry in the minutes reflecting the amendment.

Lastly, the minutes of sentencing should be corrected to reflect that the trial court imposed the second degree murder sentence (count one) at hard labor. Although the minutes state that the sentence for count two (possession of a firearm by a convicted felon) was to be served at the Louisiana Department of Corrections, the minutes do not state where the sentence is to be served for count one (second degree murder). According to the transcript, the trial court read aloud the penalty provision for second degree murder: "'Whoever commits the crime of second-degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.'" The trial court then stated, "At this time, the Court orders that sentence be imposed on Mr. James Sanford Snider, and he be ordered to serve the balance of his life while incarcerated for the murder that occurred." Since the trial court ordered "that" sentence be imposed after stating the penalty provision for second degree murder (specifically stating hard labor), the minutes should reflect that the sentence for second degree murder was ordered to be served at hard labor.

"[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ*

*denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Accordingly, we order the trial court to correct the minutes of sentencing to accurately reflect that the trial court imposed the sentence for count one (second degree murder) at hard labor.

## ASSIGNMENT OF ERROR

In his sole assignment of error, Defendant contends the evidence was insufficient to support his convictions; specifically, he contends that he proved by a preponderance of the evidence that he was insane at the time of the offense. This court disagrees. The legal definition of insanity in Louisiana is set forth in La.R.S. 14:14: "If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility." "The determination of sanity is a factual matter reserved to the jury or other fact finder." *State v. Claibon*, 395 So.2d 770, 772 (La.1981). In accordance with the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), the court in *Claibon* noted that where a sufficiency claim is raised relating to an affirmative defense of insanity, a reviewing court is required to "determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence in the light most favorable to the prosecution, could conclude that defendant had not proved by a preponderance of the evidence that he was insane at the time of the offense." *Id.* at 772.

Initially, the determination of whether Defendant proved by a preponderance of the evidence that he was insane is an issue based entirely on witness credibility. The supreme court has previously addressed this issue:

> The jury in this case, before deciding the factual issue of insanity, was required to make credibility determinations among the witnesses and to decide what weight, if any, to give the testimony of the expert

9

witnesses. The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the "fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law."

*State v. Williams*, 07-1407, p. 15 (La. 10/20/09), 22 So.3d 867, 879-80, *cert. denied*, 560 U.S. 905, 130 S.Ct. 3278 (2010).

In the present case, we note only a single expert witness testified regarding Defendant's sanity, Dr. Hayes, who was unequivocal in his assertion that Defendant did not meet the legal definition of insanity at the time of the shooting. Defendant stated to law enforcement that he lured the victim to the location where he shot him, claimed he poked the victim in the chest with the gun hoping he would react aggressively, insisted he only shot the victim once in the chest because he did not want to injure anyone else, and even exclaimed he did not shoot "Junior" because he had no problem with him.

While Defendant insinuates Dr. Hayes's testimony should be suspect because "Dr. Patrick Hayes was a paid State consultant," the fact remains Defendant stipulated to Dr. Hayes's expertise in the field of psychiatric medicine and his ability to give an opinion in that field. Defendant contends that Ms. Larson, whom he incorrectly refers to as "Dr. Molly Larson," knew him better because she treated him for two years and, therefore, was in a better position to understand his psyche. However, Ms. Larson was not accepted as an expert and rendered no opinion, lay or expert, as to Defendant's sanity at the time of the shooting; an unsurprising result given Defendant had not spoken to Ms. Larson in roughly a year at the time of the shooting. Defendant also relies on the testimony of Mr. Victorian who testified he had never seen Defendant act the way he did prior to the shooting. Again, Mr. Victorian is not an expert in any psychiatry-

10

related field, and testified he was in and out of his house that day because he and his family were getting ready for a trip.

Additionally, the jury saw video of the shooting, Defendant's statement to law enforcement at the scene that he thought the victim would be armed, and his entire statement to law enforcement after his arrest, during which he bemoaned the fact "Sticker" had not also been present and that he did not have any Jameson to celebrate taking a predator off the street. While Defendant contends "expressing desire to get sentenced to die by lethal injection cannot be considered normal under any circumstances[,]" the fact remains that simply is not proof Defendant met the legal definition of insanity. In short, the jury chose to believe Dr. Hayes's testimony, including his assertion that he believed Defendant kept bringing up lethal injection as part of an overall defense strategy. Given the evidence presented at trial, we cannot say Defendant proved by a preponderance of the evidence that he was insane at the time of the offense. Accordingly, this assignment of error lacks merit and Defendant's convictions and sentences should be affirmed.

## CONCLUSION

Defendant's convictions and his sentence for possession of a firearm by a convicted felon are affirmed. Defendant's sentence for second degree murder is amended to delete the trial court's statement regarding diminution eligibility, and the trial court is instructed to make an entry in the minutes reflecting the amendment. The trial court is also ordered to correct the minutes of sentencing to

11

accurately reflect that the trial court imposed the sentence for count one (second degree murder) at hard labor.

**CONVICTION AFFIRMED; SENTENCE AFFIRMED, AS AMENDED; REMANDED WITH INSTRUCTIONS.**