**16-437**


**STATE OF LOUISIANA**

**VERSUS**

**GERALD BRENT DEBARGE**


**\*\*\*\*\*\*\*\*\*\***
**APPEAL FROM THE**
**FOURTEENTH JUDICIAL DISTRICT COURT**
**PARISH OF CALCASIEU, DOCKET NO. 20932-13**
**HONORABLE G. MICHAEL CANADAY, PRESIDING**
**\*\*\*\*\*\*\*\*\*\***


**SYLVIA R. COOKS**
**JUDGE**


**\*\*\*\*\*\*\*\*\*\***


Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and John E. Conery, Judges.


**AFFIRMED WITH INSTRUCTIONS.**

John F. DeRosier, District Attorney
Karen C. McLellan, Assistant District Attorney
901 Lakeshore Drive, Suite 800
Lake Charles, LA 70601
(337) 437-3400
**ATTORNEY FOR APPELLEE**
    State of Louisiana

Brent Hawkins
P.O. Box 3752
Lake Charles, LA 70602-3752
(337) 210-8811
**ATTORNEY FOR DEFENDANT/APPELLANT**
    Gerald Brent DeBarge

**COOKS, Judge.**

Defendant, Gerald Brent DeBarge, is again before this court seeking review of his conviction and sentence for stalking, a violation of La.R.S. 14:40.2. In Defendant's previous appeal, we set forth the following procedural history:

> Defendant was charged by grand jury indictment with one count of stalking, a violation of La.R.S. 14:40.2(A). Defendant entered a plea of not guilty to the charge. The State amended the indictment to change the date of the offense and to add the initials of the victim. On that same date, Defendant informed the trial court of his desire to represent himself. Defendant was allowed to represent himself; however, during the trial Defendant announced his desire for an attorney but refused the trial court's offer to have Catherine Stagg sit with him during trial. When Defendant lay down on the floor and refused to get up during trial, the trial court recessed until the next day. The following day, Defendant stated that he was ready to proceed with trial and again refused the trial court's offer to have Stagg assist him during trial. Thereafter, on January 10, 2014, the jury found Defendant guilty as charged.
>
> At Defendant's request, Stagg represented him at sentencing on January 17, 2014. Due to Defendant's unruly behavior, he was removed from the courtroom before sentence was imposed. Pursuant to La.R.S. 14:40.2(A), the trial court found beyond a reasonable doubt that Defendant placed the victim in fear of death or bodily injury by his continued harassment. Finding the maximum sentence appropriate, the trial court sentenced Defendant to five years with the Department of Public Safety and Corrections, to be served without benefit of probation, parole, or suspension of sentence. Finally, the trial court issued a protective order against Defendant and in favor of the victim for an indefinite period of time. Defendant's counsel waived any reconsideration of sentence.

*State v. Debarge*, 14-798, pp. 1-2 (La.App. 3 Cir. 3/18/15), 159 So.3d 526, 526-27. In our review of the previous appeal, we found an error patent occurred because Defendant was not present for the imposition of his sentence. Thus, we pretermitted Defendant's assigned error and remanded the case for resentencing with the Defendant present and represented by counsel unless waived. *Id.* at 530.

Unbeknownst to this court and prior to our March 18, 2015 opinion, Defendant was resentenced on January 30, 2015, pursuant to a Pro Se Motion to Vacate Illegal Sentence. The trial court noted two reasons for the re-sentencing. First, after Defendant's original sentencing, one of his prior felony convictions was

2

reduced to a misdemeanor. *State v. Debarge*, 13-1060 (La.App. 3 Cir. 6/4/14) (unpublished opinion). Thus, Defendant was no longer considered a second felony offender. Second, the trial court noted Defendant was not present for the imposition of sentence. At the re-sentencing, the trial court sentenced Defendant to serve five years with the Department of Corrections, thirty-three months suspended, and thirty-six months of supervised probation with various conditions. The unsuspended portion - twenty-seven months of imprisonment - was imposed without benefit of probation, parole, or suspension of sentence.

Defendant filed a Motion and Order for Appeal, which contains a file-date stamp of February 12, 2016. In that motion, appellate counsel stated that because this court pretermitted consideration of Defendant's assignment of error in his original appeal, Defendant never had the opportunity for appellate review of the merits of his case. According to the order signed by the trial court, the motion for appeal was granted on February 12, 2015. This appears to be a typographical error, as the appeal was actually granted February 12, 2016. Since Defendant is still within the two-year time period for seeking post-conviction review of his original appeal, and the State has no opposition to Defendant receiving an out-of-time appeal, we will treat this appeal as timely filed.

## FACTS

Defendant was charged with and convicted of stalking the victim, Aimee Glatt, between June 1, 2013, and July 13, 2013. Although the record established Defendant sent hundreds of letters to the victim, the State introduced only three letters at trial. Defendant and the victim were previously married but divorced prior to the offense. Because of Defendant's harassing behavior, the victim obtained a restraining order against Defendant prior to the stalking offense. Although the restraining order prohibited Defendant from contacting the victim, he continued to send letters to her. According to the victim, receiving letters from

Defendant was a reoccurring problem that caused her great distress and fear. One letter in particular caused the victim to believe that the Defendant was threatening to show up at her door and try to take her and her son with him.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. As noted above, due to Defendant's absence when his original sentence was imposed, this court vacated the Defendant's sentence imposed January 17, 2014, and remanded the case for resentencing in the Defendant's presence as required by La.Code Crim.P. art. 835. *Debarge*, 159 So.3d 526. This court was not aware Defendant had filed a *pro se* Motion to Vacate Illegal Sentence on August 2, 2014, which was taken up by the trial court on November 14, 2014, but was continued to January 30, 2015, at the request of the defense. On January 30, 2015, Defendant was resentenced.

As evidenced in the court minutes in the record currently before this court, these resentencing proceedings occurred during the pendency of Defendant's original appeal. Thus, it is questionable whether the trial court had jurisdiction to act prior to this court's March 18, 2015 remand to the trial court for resentencing.

Louisiana Code of Criminal Procedure Article 916 divests the trial court of jurisdiction upon the entering of an order of appeal, which, in this case, occurred on January 17, 2014. Thereafter, the trial court has no jurisdiction to take any action except as otherwise provided by law and in limited situations set forth in La.Code Crim.P. art. 916. One such situation is correction of an illegal sentence. Defendant's pro se motion to correct an illegal sentence was based on the error concerning his absence when his sentence was imposed, a violation of La.Code Crim.P. art. 835.

Thus, we find no error occurred because Defendant's absence from the imposition of his original sentence, although a violation of La.Code Crim.P. art.

835, resulted in an illegal sentence. Thus, the trial court had the authority to act, as it was correcting an illegal sentence as allowed by La.Code Crim.P. art. 916. Additionally, in effect, the trial court's action, though premature, complied with this court's order issued a few months thereafter.

We do note the court minutes of sentencing require correction. The court minutes reflect the court's imposition of a $300 fine, court costs, and $75 reimbursement to the Indigent Defender Board; however, they do not reflect the trial court's order that a payment plan for these amounts be prepared by the Office of Probation and Parole and submitted to the trial court for approval, as stated in the sentencing transcript. "[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Accordingly, the trial court is ordered to correct the sentencing minutes to accurately reflect this provision of Defendant's sentence.

## PRO SE ASSIGNMENT OF ERROR

As will be discussed in the following paragraph, Defendant's pro se brief could be interpreted as alleging insufficient evidence. When the issues on appeal relate to both sufficiency of the evidence and one or more trial errors, an appellate court should first determine the sufficiency of the evidence. The rationale is that when the entirety of the evidence is insufficient to support the defendant's conviction, the defendant must be discharged as to that crime, and any other issues become moot. *State v. Hearold*, 603 So.2d 731, 734 (La.1992). Thus, we will first address Defendant's pro se assignment of error.

In his pro se brief, Defendant does not set forth a clearly defined assignment of error. Rather, he complains his civil rights were violated by the denial of his writing privileges. Defendant also asserts that three weeks before trial, he was beaten and taunted by law enforcement officers. Additionally, Defendant

5

complains the bullying tactics by the State caused local attorneys to refuse to represent him. These claims do not involve the merits of Defendant's conviction and sentence and are not proper for this court to review.

The only discernable allegation regarding Defendant's conviction is the implication that the evidence was insufficient to convict him of stalking:

> Defendant Gerald DeBarge is not guilty of the crime of stalking. And surely defendant Gerald DeBarge is not guilty of the misdemeanor crime of violating a protective order either. Whereas said protective order was unwarranted from the get-go, for which the defendant has Never [sic] been allowed due process, has never been tried in court for, and for which, regarding the order that was prejudicially presented to the jury during a trial for the separate crime of "stalking", supposed victim and convicted felon Aimee Glatt NEVER sought, (as evidenced by the fact that she had no memory of seeking it, and by the fact that her signature is not on it.)

We will address the above allegation as a challenge to the sufficiency of the evidence as to the Defendant's conviction for stalking.

The analysis for insufficiency of the evidence claims is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

The State charged Defendant with stalking the victim, Aimee Glatt, between June 1, 2013, and July 13, 2013. Although it was well-established at trial that the Defendant sent the victim numerous letters (over 500), the State relied on three letters in particular. The letters were sent to the victim while the Defendant was in

6

jail.

The first letter, S-1, is entitled "Threshold[,]" and reads as follows:

You ask, "What is it?" at the door.

It is that you're exquisite, nothing more.

The second letter was received by the victim at her home around July 2013. The second letter is written on an inmate grievance form and states the following:

Everytime he goes down, Tony Mancuso uses his teeth too much – this grieves me exceedingly.

* Angelica Dick turns 27 today!

P.S. If you're a C.P.S.O. Deputy and you're reading this, Gerald DeBarge said to eat his dick. TYVM.

The final letter was received by the victim at her home on June 29, 2013. This letter is much longer than the other two, and reads:

Aimee my love,

Since I received two separate copies, (one is enclosed), signed by Judge Canaday stating that I was only given my "writing priveleges [sic]" back after the stalking/protective order charges "were resolved" - I know that it's legal for me to contact you now.

Legalities notwithstanding, if at any time you wish me not to write you, simply write refused on the envelope and send it back. I assure you that I will not waste a single stamp writing to someone who considers my letters unwelcome in deed, and not just in words.

Gerald Brent

P.S. 1) Because I don't like wasting paper 2) just for the fun of it, 3) and mostly because 500 + unrefused letters prove to me beyond a shadow of a doubt that no one on this planet is as interested in my writings as you are – I'm enclosing a copy of a letter I just mailed to Theresa Schmidt, Bob Jindal, and the ACLU of LA.

* Not that any of them will give a crap, it was just fun to do.

The enclosed letter referred to by Defendant states the following:

To whom it may concern,

On November 9, 2012, without advance notice or any sensible explanation, 14th J.D.C. Judge G. Michael Canaday ordered that

inmate/untried defendant Gerald DeBarge "have no writing priveleges [sic]."

For the next 4 months, as confirmed by several letters signed by Warden H. Greg Tete, Gerald DeBarge was disallowed/prevented from sending any mail to his mother, children, girlfriends, appeals court, attorneys, media, etc.

According to attorney Angel Harris of the Public Defender's Office, a Georgetown University Law School graduate, Judge Canaday's order is unprecedented in the entire history of the United States of America.

And until they take my pen away, have yourself a lovely day.

Gerald Brent

P.S. I'm reading this book today, (the first I've read in over a month), by a lunatic author named Chris Moore, and I'm laughing so hard my face is hurting. The book is sorta [sic] about whales, but instead of "Call me Ishmael," the book begins with, "Aimee called the whale punkin [sic]."

Aimee testified at trial that she and Defendant had been married, but the marriage ended in May 2011. Aimee identified a restraining order protecting her against Defendant, which was obtained a couple of months before she filed for divorce. Aimee explained that Defendant was dumping old garbage "like rotten potatoes" in her yard. Aimee testified that Defendant would dump the trash while she and her son were sleeping. Defendant also lined all of the house windows with Easter eggs and left strange messages. When asked to explain the messages, Aimee replied:

He was texting me to let me know that it was him who did it. He said he had some camouflaged eggs. They were camo-colored, and he said Ash might have trouble finding the camo eggs, but he'll be all white because some of them are white, just cryptic messages to let me know for sure that it was him who came and did it.

Aimee explained that "Ash" is her son, Ashton. Aimee further described the strange messages as follows:

Filthy text messages, letters, coming over, like I said, releasing garbage in our yard, even my parents he was harassing, just - - coworkers.

Aimee testified that Child Protection sent her to the Women's Shelter because of some things Ashton said about Defendant. In response to Ashton's statement, Child Protection told Aimee to leave with Ashton, to get restraining orders, to change schools and buses. According to Aimee, the restraining order also protected Gary Miles, her present husband, and Ashton, her son. Aimee described her divorce from the Defendant as "not amicable at all" with a "lot of physical abuse." Aimee described the abuse as "[p]hysical, emotional, mental, coming to my jobs." According to Aimee, even her coworkers have restraining orders against Defendant. Aimee felt it was necessary to leave the home, so she and her son moved in with Gary Miles. Aimee testified that she and Gary were just friends when she divorced the Defendant.

Although part of the reason she obtained a restraining order was to protect Ashton, Aimee testified that she also obtained the restraining order to protect herself:

> A: Yes, ma'am, but also him following me. I would, you know, be at McDonald's and he would just - - I'd get a text saying, "How are the fries?" Like anywhere I was, I would get a - - I was picking my son up in the circle. He used to go to St. John's, and Gary was with me and he lit a cigarette, and Gerald knew I did not smoke, and he texted, "It must suck to live with smokers." And, you know, we don't see him anywhere. It was constant.
>
> Q: So, and I know you have made statements to detectives - - to the detectives during the investigation of this case that you feared Mr. DeBarge.
>
> A: Absolutely.
>
> Q: At that time were you afraid of him or had concerns for your safety?
>
> A: Absolutely.

Aimee remembered attending a hearing for the protective order, a hearing at which Defendant was present. As far as Aimee knew, Defendant received a copy of the restraining order the day of the hearing. Aimee testified the restraining order

was effective until September 2, 2013, and prohibited Defendant from abusing, harassing, stalking, following, or threatening the protected person. The restraining order also prohibited the Defendant from using, attempting to use, or threatening to use force or physical violence that would reasonably be expected to cause bodily injury. Additionally, the order prevented Defendant from contacting the protected persons personally, electronically, by phone or in writing. According to Aimee, she began looking for a new house so the Defendant would not know where they lived.

The State then asked Aimee about the "threshold" letter that the Defendant sent her. The letter was entitled "Threshold" and stated, "You ask what is it at the door. It is that you are exquisite, nothing more." Aimee explained why the letter alarmed her:

> A: I know him. I know the way he writes. He writes flowery and poetic that way and I understand.
>
> . . . .
>
> A: Okay. Well, his previous other - - his own letters . . . had reference to, "I'm coming. I will get my wife and son," you know. Then, writing "Threshold," to me was threshold of a door, you know. I'm standing at your threshold. And, when I'm at the door you'll say what is it, but it's just to say you are exquisite, nothing more. I got that I'm coming. Don't be alarmed. Don't think it - - it's just to come get you back, you know. It's a good thing. I'm coming for my wife, you know. You'll say what is it at the door, but it's just you're exquisite, nothing more when he's at the threshold of my door. And he'd done it several times, been at the threshold of my door. So, it was to pattern [sic].
>
> Q: So, it's your personal view based on your experiences with him that if he had shown up at your door, you would have been afraid of what could have happened?
>
> A: Absolutely.
>
> Q: Okay. So, just to be clear, you took that letter as a threat?
>
> A: I absolutely did.

Aimee further explained her reason for being distressed and alarmed by the letters as follows:

> A:      It changes every aspect of your entire life.  My son has a little bike posse.  They ride to school.  They love it.  They get on their bikes and they ride, and they ride home.  When he, Mr. DeBarge, is out, we can't do that.  I bring them everywhere.  I won't let him walk three houses down to a friend in the neighborhood.  I will drive him down.
>
>        . . . .
>
> A:      My son goes to counseling at Stonebridge.  I go with him.  He recognizes the handwriting by now, and I try to get the mail before he does, because sometimes he checks it and he just gets angry.  We've been dealing with this since first grade.  He's in fifth grade now.
>
>        . . . .
>
> Q:      And what I want to do is to focus your testimony a little bit more because I know this is a big issue for you, and I want the jury to be clear on the emotional distress.  My question to you is how have these letters, the receipt of these letters that we're here to talk about today, and, yes, in light of your entire history, how have these letters caused you to feel the alarm and emotional distress that you believe substantiates the stalking charge?
>
> A:      I get physically sick.
>
> Q:      Why do you feel stalked?
>
> A:      I get physically sick when I see that handwriting on a letter, physically sick. . . .
>
>        . . . .
>
> Q:      Are you afraid?
>
> A:      Absolutely afraid.
>
> Q:      Are you afraid to the point of do you feel - - truly feel threatened?
>
> A:      We moved entire houses.  We have set up and spent all of our money on surveillance cameras all around our houses.  The guys have gotten things to protect themselves, yeah.
>
> Q:      Okay.  And, in reading these letters, to be clear, in each one of these letters did you feel that they indicated there were implied threats of any sort to you or did he just mean to harass you or both?
>
> A:      Both.  I have had outright threats and I've just had just drive me crazy [sic].  I've had both.

11

Q:    And you believe that to be so because of this history that you've explained to the jury?

A:    And just the more and more I see, you know, if he would do this X, he would do this. (sic) It seems like his behavior is just getting more and more irrational and I don't know the limits he would go anymore.

Q:    Have you ever had a period of time since you all split households where you have not had unwanted contact from Mr. DeBarge?

A:    Even when we moved, and he was not around when we moved, so he couldn't have watched us, he got that address very quickly, and it started at that house, too, and with jokes that, ha, I got your address.

Q:    Now, to be clear, you stated that the "Threshold" letter implied to you that he might come to your door.

A:    Yes, ma'am.

Q:    And did you fear that, if he just showed up at your door, it would be an argument or a fight or did you truly, as you sit here under oath, believe that this was some other sort of a threat, a more serious threat?

A:    The threat that I will come get my wife and son.

Q:    What does that mean to you?

A:    That, if I didn't want that, if I didn't go willingly, it's going to be ugly, but it's going to be his way.

When asked about the Defendant's statement in one of the letters that he had written Aimee over 500 letters and would stop if she returned any of them, Aimee testified that even though she wanted Defendant to stop sending her letters, she was advised not to send any of the letters back. Aimee testified that she was told by detectives that if she did so, it would look like she was still listening to Defendant.

During Defendant's cross-examination, Aimee testified she actually obtained three different restraining orders against Defendant. She also testified she never had a "constant break" from Defendant's letters.

12

Gary Miles, Aimee's husband, testified Defendant and Aimee communicated a lot through poetry during their relationship. Gary stated often Aimee would have to explain Defendant's letters to him. Gary testified Aimee would get very upset when she received a letter from Defendant. According to Gary, Aimee would say things like, "If he gets out, he's going to kill me." Gary testified the "Threshold" letter seemed to have a larger impact on Aimee than the other letters. Gary was Aimee's friend during her marriage to Defendant, and Aimee would complain to him about physical and mental abuse. Aimee would show up on occasion at Gary's house "crying and screaming." As for the protective orders, Gary testified that Aimee was adamant about keeping the protective order in effect because she was afraid of Defendant. When asked if there was any question in his mind that Aimee was afraid of the Defendant, Gary replied, "Oh, I know she is[,]" and the following colloquy ensued:

Q: Does it make sense to you, in light of everything you know about her and her history with Mr. Debarge that she would have that sort of fear, based on your personal observations and your experience of this whole situation?

A: Yes. I can understand why she is.

Q: Are you afraid of him?

A: Yes and no.

Q: Can you explain that?

A: Unpredictability, obsessive compulsive type actions, you know, just won't let go. I mean just will not let go. I mean when it's over it's over, and everybody has moved on except him, it seems like. And, you know, he just needs to let it go. And, being so unpredictable and stuff, it's hard to know what could occur, you know, what he might or might not do. It's hard to make a decision, you know. Sometimes I try to give people the benefit of the doubt, but sometimes it's better to be safe than sorry, you know, especially when you exhibit or you witness an exhibit of a roller coaster ride of emotions and compulsive obsession type things, and it's scary. I mean, you know, I just find him to be very unpredictable and still obsessed on Ms. Glatt, my wife now.

Elrick Jones, a Calcasieu Parish Sheriff's deputy, responded to Aimee's call on July 3, 2013, regarding a violation of a restraining order. When the deputy arrived at the scene, Aimee showed him a letter she had received that same date and showed him a restraining order against Defendant. Deputy Jones explained that Aimee had a "no contact/no communication restraining order," and she received a letter from Defendant.

When asked by Defendant (who was representing himself at trial) if Aimee was emotionally distressed and alarmed, Deputy Jones replied, "Yes. She did not want to receive letters from you." Deputy Jones further described Aimee as being stressed and in "fear of her life" because of the letter she received.

Deputy Landry Willis of the Calcasieu Parish Sheriff's Office testified that he also responded to a call from Aimee on July 9, 2013. Aimee complained that Defendant violated a restraining order by sending her a letter. According to Deputy Willis, the letter that he read contained no threats of death or bodily injury.

Sarah Stubbs, a detective with the Calcasieu Parish Sheriff's Office, testified by the time Aimee came to the Sheriff's Office on July 10, Aimee had received a third letter. When asked what Aimee's complaint was, Detective Stubbs testified:

> Her complaint was that she had a relationship with Mr. DeBarge previously. They were no longer together. She had a restraining order against him, and she had received numerous letters, even after she did not want them. She was currently remarried, and she was afraid.

Detective Stubbs verified that a protective order was in place when Aimee received the letters. Detective Stubbs identified the protective order, which listed Aimee Renee Glatt DeBarge as the protected person and Gerald Brent DeBarge as the defendant. The protective order was filed in March, 2012, and was effective until September 2, 2013.

According to Detective Stubbs, Aimee thought the "Threshold" letter meant that Defendant was going to show up at her residence. Detective Stubbs testified

14

Aimee was very afraid of Defendant. Detective Stubbs testified Aimee was concerned because this was not the first time she had received letters from the Defendant. When asked if Aimee expressed concern about the letters, Detective Stubbs responded, "Extreme concern[,]" and elaborated in the following colloquy:

Q: Did she express to you why these letters were of a concern to her?

A: She did. She explained the history, which is important, especially the way that she took the Threshold letter, the way she viewed it.

Q: Okay.

A: She was afraid, very afraid.

Q: Okay. How did she view the Threshold letter?

A: In her mind it meant, as soon as he was able to, he would be at her door.

Q: I'm sorry, I didn't hear you.

A: As soon as he was able to be in the area, he would be at her residence.

Q: So, the Threshold letter says, "You ask what is it at the door. It is that you are exquisite, nothing more."

A: Yes.

Q: She said that meant what exactly? And I want to be sure the jury understands what you're saying.

A: That he would show up at her residence, and when she answered it would be him at the door.

Q: And do you - - Did she explain to you why she believed that to be the case?

A: Because there were four times that it happened that he had been - - I'm trying to say it, but we can't, uh - - He has been incarcerated and four times he had been released. He had shown up at her door within 24 to 48 hours.

. . . .

Q: Do you have any - - Were you able to - - Well, in regards to the other letters that she received, let's talk about S-2. Let's just take it step by step, S-2. The document that was on the Corrections Division

Inmate Grievance Form, was she able to give you any explanation or offer any explanation as to its meaning to her?

A:     I would have to look at my report to refresh because I - - I just remember talking to her about all of them. I just remember her being afraid and she did not want to send a letter back refused written on there because, to her, that would be communicating. That would be telling him to continue communicating, playing a game with him, and she didn't want to do that. She didn't want any contact with him at all and she could not get him to stop.

Q:     So, she was adamant in her communications to you that she did not want any further communications with Mr. DeBarge.

A:     Correct.

Q:     And did she state to you that this had been a - - that this was a repeated problem for her?

A:     Yes, she did.

Q:     Did she appear to be distressed about it?

A:     Very.

Q:     Okay.

A:     Very distressed.

On July 10, 2013, Detective Stubbs spoke with Defendant in regards to Aimee's allegations. An audio recording of Defendant's interview was played for the jury. The following colloquy took place between Defendant and the detectives:

Q     What we have, Mr. DeBarge, is we have a complaint filed on July 3, 2013 by Mrs. Glatt. There is a restraining order between y'all and that you have been mailing her letters. Is that correct?

A     Hell, no.

Q     You haven't mailed her any letters whatsoever?

A     Okay. There was a restraining order; okay?

Q     Okay.

A     I was in court in March and the District Attorney asked me to sign an amended restraining order because they messed up on the paperwork and the restraining order was supposed to go through September; but, because they did the paperwork wrong, it expired in March, or something like that. So, I said, for one, I have never been given a hearing. It's never been determined that I was ever a danger,

16

that any restraining order was ever warranted. I said I signed it under duress, and the only condition I signed it on was that there would be mutually restraining orders, you know. And I said then I had a lady that lied to me. They weren't mutual restraining orders. I said, so, no, I'm not going to help y'all finish y'all's paperwork because, you know, because they said - - they agreed to say - - and I'm like, okay, if there was a restraining order, a legal, valid, restraining order what the hell do they need me to sign it to change it? So, I'm saying it's not valid; okay?

Q    Okay.

A    I also got a letter from the Judge who - - now, this is real good - -he decided that the First Amendment of the United States Constitution didn't apply to me. I got a letter from him that said he took away my writing privileges. For four months I was not allowed to write a letter. I was not allowed to write an appeals court, a lawyer or the news media, nobody; okay? And the reason it was is because I was violating a restraining order by writing Aimee Glatt; okay? That's what he told me.

Q    Okay.

A    Okay. Then he wrote me a letter and said he restored my writing privileges because all of that - - those letters had all been resolved.

Q    Okay.

A    Okay. So, if he took my writing privileges because I was writing her and then he gave them back, I assume it means I can write her. Why the hell not?

Q    But, the fact of the matter is that the restraining order isn't supposed to expire until September of this year.

. . . .

A    I'm just saying if that's true, when did - - (unintelligible) - - and Angel Harris told me do not sign that.

When asked why he was writing to Aimee, Defendant said he was exercising his First Amendment right. Defendant acknowledged that he probably sent Aimee about 500 letters over the past three years but always told Aimee to write "refused" if she wanted him to stop writing her. When asked if he thought a restraining order meant he could "tell her that," the Defendant replied that "a restraining order is illegal."

17

The State asked Detective Stubbs what evidence led her to believe that stalking had taken place in this case:

A:     Well, with the repeated contact, unwanted contact, a 500 plus from his own letters that he had sent her, and from her statement, she had told me there was probably - - because I asked her, "How many would you guesstimate or estimate that you have received?" And she said, "Probably 500 or more." From, [sic] all the information we received and from his letters, it's constant, unwanted contact from Mr. DeBarge.

Q:     Okay. Was Mrs. Glatt in any way equivocal or unclear in her statements about not wanting contact from Mr. DeBarge?

A:     No. She was very clear, very adamant that she did not want contact and she was afraid of him, and it was very stressful for her life having to deal with this.

Q:     Okay. Based on your personal observations of her during your meetings with her and your conversation with her about these letters and her history that you alluded to earlier in your testimony, what was your impression of the impact these - - the receipt of these letters had on her?

A:     It caused a great deal of emotional turmoil, stress. She demonstrated - - I remember her getting very emotional, her eyes tearing up. I don't remember if she cried or not, but I just remember her wanting it to stop. I mean, she is just, from what I observed, it seems like it has just been a lot that she had to deal with and she is afraid of him, very afraid.

As for the validity of the restraining order, the following colloquy took place between the State and Detective Stubbs:

Q     Okay. During the course of your investigation did you obtain any information that would lead you to believe that the restraining order that we discussed earlier and that has been offered or has been marked for purposes of identification as S-4 - - do you find anything to lead you to believe that it is not valid or was not in effect when these letters were sent to Mrs. Aimee Glatt?

A     I did not. And, usually I will get a copy of the service information unless, like this one, the defendant had signed it stating that they were aware of it; but there is nothing that I saw that showed that it was not valid.

After Defendant cross-examined Detective Stubbs, the State asked her about a letter the Defendant referred to in his cross. The letter was marked as S-6 and was received by Detective Stubbs on July 11 (the day after the Defendant's

interview). Greg Tete, the Assistant Warden of the Calcasieu Parish Sheriff's Prison, gave the letter to Detective Stubbs. The letter was addressed to "Mr. and Mrs. Fred Vale" but contained the street address for Aimee's residence. The letter was intercepted, so it was never mailed to Aimee's address. The contents of the letter named the two detectives that interviewed the Defendant as the intended recipients. The letter states:

> To ~~Dumb & Dumber~~, excuse me, I mean Dear Senor Juarez and Detective Snubbed – if you two ~~brain trusts~~, I mean super sleuths, would provide me with a copy of the valid protective order that you say doesn't expire until September 2013, I'll plead guilty and we'll wrap this up quick like and in a hurry.
>
> Cordially yours,
>
> Gerald Brent DeBarge
>
> P.S. A deputy told me today that when Sheriff Mancuso's wife looks at her vagina she just looks at him – I just took him at his word.

After hearing the above testimony, the jury found the Defendant guilty of stalking. At the time of the commission of the offense in the present case, the offense of stalking, La.R.S. 14:40.2, provided in pertinent part:

> A. Stalking is the intentional and repeated following or harassing of another person that would cause a reasonable person to feel alarmed or to suffer emotional distress. Stalking shall include but not be limited to the intentional and repeated uninvited presence of the perpetrator at another person's home, workplace, school, or any place which would cause a reasonable person to be alarmed, or to suffer emotional distress as a result of verbal, written, or behaviorally implied threats of death, bodily injury, sexual assault, kidnapping, or any other statutory criminal act to himself or any member of his family or any person with whom he is acquainted.
>
> . . . .
>
> C. For the purposes of this Section, the following words shall have the following meanings:
>
> (1) "Harassing" means the repeated pattern of verbal communications or nonverbal behavior without invitation which includes but is not limited to making telephone calls, transmitting electronic mail, sending messages via a third party, or sending letters or pictures.

(2) "Pattern of conduct" means a series of acts over a period of time, however short, evidencing an intent to inflict a continuity of emotional distress upon the person. Constitutionally protected activity is not included within the meaning of pattern of conduct.

The evidence was sufficient to prove Defendant intentionally and repeatedly harassed the victim by sending her numerous, uninvited letters. Although the State relied on three letters at trial, Defendant admitted that he had sent the victim over 500 letters. Even though Defendant claimed he thought the victim wanted to receive the letters since she never sent any back with the word "refused" written on the envelope, Defendant knew of the victim's desire to have no contact with him since she obtained a protective order prohibiting such. Despite Defendant's claim that the protective order was invalid, it was signed by him prior to the stalking offense. In his statement to Detective Stubbs, Defendant claimed he was called back into court to sign an amended protective order but refused to do so. Even if Defendant refused to sign an amended protective order, Defendant was on notice that Aimee did not want to be contacted by him. Thus, Defendant knew the victim did not want to receive letters from him, yet he continued to send them to her. Considering the testimony introduced at trial, including the acrimonious relationship between Defendant and the victim as well as Defendant's prior unwanted contact with the victim, the jury's determination that Defendant's harassment caused the victim to feel alarmed for her safety and to suffer emotional distress was reasonable. The evidence was sufficient to convict the Defendant of stalking.

### COUNSEL ASSIGNMENT OF ERROR

In his sole counsel-filed assignment of error, Defendant asserts, "There was insufficient evidence for the judge to find the Defendant guilty of stalking by placing the victim in reasonable fear of death or bodily injury." Although

appellate counsel's use of the words "insufficient evidence" in this assignment of error gives the impression that he is challenging the sufficiency of the evidence, we note the challenge is not to the jury's verdict but to the trial court's finding at sentencing that Aimee was placed in reasonable fear of death or bodily injury, thus allowing the trial court to sentence Defendant under La.R.S. 14:40.2(B)(2)(a). Appellate counsel states the jury reached its verdict without any finding of fact that Defendant placed the victim in fear of death or bodily injury. Instead, this finding was made by the trial judge at sentencing in accordance with La.R.S. 14:40.2(B)(2)(a):

> Any person who commits the offense of stalking and who is found by the trier of fact, whether the jury at a jury trial, the judge in a bench trial, or the judge at a sentencing hearing following a jury trial, beyond a reasonable doubt to have placed the victim of the stalking in fear of death or bodily injury by the actual use of or the defendant's having in his possession during the instances which make up the crime of stalking a dangerous weapon or is found beyond a reasonable doubt to have placed the victim in reasonable fear of death or bodily injury, shall be imprisoned for not less than one year nor more than five years, with or without hard labor, without benefit of probation, parole, or suspension of sentence and may be find one thousand dollars, or both. Whether or not the defendant's use of or his possession of the dangerous weapon is a crime or, if a crime, whether or not he is charged for that offense separately or in addition to the crime of stalking shall have no bearing or relevance as to the enhanced sentence under the provisions of this Paragraph.

Since the only "element" appellate counsel complains of on appeal is the finding that Defendant placed the victim in reasonable fear of death or bodily injury and the trial judge made that finding at sentencing, this assignment of error attacks Defendant's sentencing and is threefold. First, appellate counsel urges that because the jury did not find Defendant guilty of stalking the victim by placing her in reasonable fear of death or bodily injury, the trial judge was without authority to do so; second, appellate counsel seems to argue even if the matter could be properly entertained by the trial judge, he could not do so before conducting a contradictory hearing; and, third, the evidence when properly examined does not

21

sufficiently show the victim was in fact placed in fear of death or bodily injury and the trial court erred in so finding.

As to the first argument that because the jury did not find Defendant guilty of stalking the victim by placing her in reasonable fear of death or bodily injury, the trial judge was without authority to do so, we find the statute provides otherwise. An examination of La.R.S. 14:40.2(B)(2)(a) provides this finding can be made by "the judge at a sentencing hearing following a jury trial." Therefore the trial judge had the authority to render this finding at the sentencing hearing.

We also find no merit in appellate counsel's argument that a contradictory hearing should be held prior to any determination by the trial court that the victim was placed in fear of death or bodily harm. The record establishes Defendant specifically waived his right to a contradictory hearing.

At the original sentencing, defense counsel asserted that a contradictory hearing should be held prior to any determination by the trial court that the victim was placed in fear of death or bodily harm. The trial court responded:

> I don't have a problem if you want a contradictory hearing. We'll fix it. He's probably eligible for release today. But, if he wants to come back in March and have the hearing, we'll be glad to do so.

After speaking with Defendant, defense counsel informed the court that the Defendant preferred to go forward with sentencing that day:

DEFENSE COUNSEL:

> Okay. I just took a minute to - - if the record would reflect, I took a second to talk to Mr. DeBarge.

THE COURT:

> No problem.

DEFENSE COUNSEL:

> And, we'd prefer to go forward today. But, I did want to reiterate my objection, which I made strenuously the last time and are reflected in the minutes from the last time, Your Honor.

22

THE COURT:

I would also take judicial notice of the testimony that occurred during the trial. But, that doesn't give you a chance for cross-examination. So, that's why I would say, if you wanted the contradictory hearing, you can have so. But, at this time you wish to waive it?

DEFENSE COUNSEL:

According to Mr. DeBarge, yes, sir.

THE COURT:

All right. The State's position, Ms. Hawkins?

THE STATE:

Well, Your Honor, I'm not clear on what you are granting at this point. A contradictory sentencing hearing - -

THE COURT:

I'm not granting anything. She withdrew the request for a contradictory hearing. She's stating that her interpretation of the statute is that there ought to be a hearing where it can be evidentially discussed on the stand and a record made with regard to whether he falls within the guidelines of the enhancement provisions of being placed in great bodily harm or fear of death.

THE STATE:

Okay. I understand that. The State's position is that this was argued at the original sentencing hearing. I remember Ms. Stagg arguing this point, asking for same, and Your Honor ruled the State would submit that. Your Honor ruled previously on this particular issue, moved forward appropriately with sentencing; and, for reasons Your Honor stated in the record, made clear your reasoning behind imposing the particular sentence under 14:40.2 B 2 A, as I recall.

So, to the extent this is a rehashing of a motion or an issue that's already been ruled upon, I would object to that. I don't know if it is proper.

. . . .

THE COURT:

If she wishes to have a hearing, she can have it.

. . . .

THE COURT:

If you want to have your hearing, we can refix it. I anticipated basically to sentence him to five years. I was going to suspend half of that. He would do 30 months, and then be put on probation thereafter. I think, because it's a crime of violence, under 85%, he's going to have to do about 24 months. He's got about 17 - - it looks like 17 or 18 in. So, if you wish to have the hearing, I don't think he will be out today. But, that's where I'm at with regard to him being as a first offender and the history.

DEFENSE COUNSEL:

Mr. DeBarge says he would like to go forward with the hearing, Your Honor.

THE COURT:

All right. I don't have my transcript, and I don't have my original workup, Tom. (Addressing Court Bailiff)

DEFENSE COUNSEL:

I have the minutes from that sentencing. That's all I have.

THE COURT:

So, but I went through 894.2 or 894.1 with regard to - - I didn't have my docket this morning, so I don't have those matters. I can get those, maybe have them by this afternoon, to go back and reiterate them, because I'm pretty much gonna go back and enumerate those matters. What's the big thing that has changed is his offender status.

DEFENSE COUNSEL:

That's correct, Your Honor.

THE COURT:

But, he's entitled to have the 894.1 aggravating and mitigating factors stated of record. I don't have them with me. I'll do them at 1:30 if you want to.

. . . .

THE COURT:

I'm just asking them. I mean, they're entitled to the sentencing hearing. They have a good idea of what I want to do. But, I mean, he's the only one that can complain. Well, the State can complain, but - -

DEFENSE COUNSEL:

>> Mr. DeBarge wants to go forward, Your Honor, if possible, if the Court has already formulated a potential sentence.
>
> . . . .
>
> THE COURT:
>
>> So, for the record, is he willing to waive reiteration of 894.1 and have the Court resentencing consistent with what has been stated in open court today?
>
> MR. DEBARGE:
>
>> Yes, sir.

As Defendant waived his right to a contradictory hearing, this assignment of error is without merit.

Lastly, appellate counsel argues the evidence when properly examined does not sufficiently show the victim was in fact placed in fear of death or bodily injury. We find no error in the trial court's finding that the State met its burden of proving Defendant placed Aimee in reasonable fear of death or bodily injury.

The testimony at trial established there had been a "lot of physical abuse" during the marriage between Defendant and Aimee. Aimee testified Defendant followed her and would frequently text her to let her know he was watching her. Defendant also entered Aimee's yard and dumped garbage throughout the yard while she and her son were inside the residence sleeping. Defendant lined her house windows with Easter eggs on one occasion. Clearly this led to Aimee's fears that Defendant had no concern about coming and going from her residence as he wished. Aimee testified Defendant's behavior required her to seek a protective order for her and her son's safety. Mr. Miles, Aimee's current husband, testified Aimee would state that if Defendant was released from jail, she believed he was going to kill her.

Aimee testified she believed the "Threshold" letter meant that Defendant was physically going to show up at her door and that he "will come get my wife

and son." Deputy Jones testified it was his opinion that Aimee was in "fear of her life' due to the letters she received. Detective Stubbs testified the victim expressed "extreme concern," particularly over the "Threshold" letter. Detective Stubbs explained that Defendant had on four prior occasions showed up at Aimee's door within 24 to 48 hours of being released from jail. Detective Stubbs believed Aimee was "very distressed" due to Defendant's consistently threatening behavior toward her and her son.

In *State v. Schexnaider*, 03-1144 (La.App. 3 Cir. 6/12/03), 852 So.2d 450, this court reiterated that the trier of fact has the discretion to accept or reject, either partially or wholly, the testimony of any witnesses, including the victim. In the present matter, the trial court found Defendant placed Aimee "in fear of death or bodily injury by his continued and actual use—and pattern of conduct and the harassment that had been part and parcel of the years leading up to the event." The evidence and testimony fully support the trial court's finding in this case.

## DECREE

For the foregoing reasons, Defendant's conviction and sentence are affirmed. The trial court is ordered to correct the court minutes of sentencing to include the trial court's order that a payment plan be prepared by the Office of Probation and Parole and submitted to the trial court for approval for the payment of the fine, court costs, and reimbursement to the Indigent Defender Board.

**AFFIRMED WITH INSTRUCTIONS.**