STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

20-265


STATE OF LOUISIANA

VERSUS

MICHAEL DAN ROBERTS


**********

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. 92477
HONORABLE TONY A. BENNETT, DISTRICT JUDGE

**********

**JOHN E. CONERY
JUDGE**

**********

Court composed of Shannon J. Gremillion, John E. Conery, and Sharon Darville Wilson, Judges.


**CONVICTION AND SENTENCE AFFIRMED.
REMANDED WITH INSTRUCTIONS.**

**Honorable Asa A. Skinner**
**District Attorney**
**Thirtieth Judicial District**
**Post Office Box 1188**
**Leesville, Louisiana  71496**
**(337) 239-2008**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Elvin C. Fontenot, Jr.**
**Attorney At Law**
**110 East Texas Street**
**Leesville, Louisiana  71446**
**(337) 239-2684**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Michael Dan Roberts**

**CONERY, Judge.**

In the midst of a mutual dispute, Defendant, Michael Dan Roberts, allegedly struck, kicked, and choked his wife, Jennifer Roberts. Mrs. Roberts was taken by ambulance to the hospital following the incident where medical personnel took photographs and noted injuries to her face, limbs, and neck. Although the State initially charged Defendant with the misdemeanor offense of domestic abuse battery, a violation of La.R.S. 14:35.3, it ultimately charged Defendant with felony domestic abuse battery by strangulation, a violation of La.R.S. 14:35.3(A) and (L). The trial court convicted Defendant as charged following a bench trial and sentenced Defendant to three years at hard labor, two of which were suspended. The trial court also imposed a three-year period of supervised probation and ordered restitution in the amount of $24,475.00 to be paid pursuant to a payment plan developed by the Department of Corrections, Office of Probation and Parole. Defendant appeals. For the following reasons, we affirm Defendant's conviction and sentence. We remand this matter for the trial court's approval of the payment plan formulated by the Office of Probation and Parole. We further order a correction of the minutes to accurately reflect the term of probation is to be three (3) years.

## FACTS AND PROCEDURAL HISTORY

According to Mrs. Roberts'[1] testimony at trial, she and Defendant were at home in Vernon Parish on the morning of the offense, March 20, 2018, when Defendant began drinking beer after having his morning coffee.

---

[1] Mrs. Roberts explained that she and Defendant had divorced by the time of trial.

Mrs. Roberts noted she worked from her home office[2] for a few hours that morning before she and Defendant left the house for a meeting with an attorney. She testified that they first stopped at the American Legion in Leesville. The couple stayed for roughly an hour, during which time Defendant drank three beers. Mrs. Roberts testified that, after spending about forty-five minutes at the lawyer's office, Defendant drove them to the Daiquiri Station, arriving "between two and 2:30, roughly." Mrs. Roberts explained that Defendant had more than three beers there. They then left because she wanted to greet their daughter, Cameron, as she arrived home from school. Mrs. Roberts noted that Defendant was getting agitated about wanting to play cards at the Daiquiri Station during the drive home. After returning home, to drop off Mrs. Roberts, Defendant immediately went back to the Daiquiri Station to play cards. He left the house before 3:30 p.m.

Mrs. Roberts noted she and Cameron were in her home office when Defendant returned around 6:30 p.m. She explained that when Defendant returned, he was smiling, he wavered a little bit in his stance, and his eyes were red. She also noted he was "a little fumbly" when he got out of the truck. Having been married to Defendant for six years at that point, Mrs. Roberts believed that Defendant had continued drinking while he was gone. Mrs. Roberts noted he stayed in the home office with her and Cameron for a few minutes, joking with them.

After he returned to the living room to watch television, Mrs. Roberts and Cameron approached Defendant to discuss his drinking. When Defendant profanely responded, Cameron began to cry. Mrs. Roberts explained that Defendant then

---

[2] Noting she has a master's degree in nursing and education, Mrs. Roberts stated that, at the time of trial, she was on long-term leave for post-traumatic stress disorder (PTSD) and traumatic brain injury. She testified that prior to her leave beginning in March 2019, she had been a senior clinical consultant for a health insurer.

pointed at Cameron and told Mrs. Roberts, "'You know what she thinks of you? She hates you. She wishes you would leave.'" Mrs. Roberts testified Defendant tried to hug Cameron, who resisted, at which point he picked her up and "put her very roughly on the couch and then s[a]t on her[,]" which led to Cameron begging him to get off. Mrs. Roberts testified that after she stood up, Defendant likewise stood up, and she put her arm up to defend herself.

According to Mrs. Roberts, Defendant then went outside to the back porch. She followed him, and he began to repeatedly curse her. Mrs. Roberts testified that, at that point, Defendant grabbed her with both hands near her shoulders and upper body and slammed her onto the tile floor. She explained that she landed on her back with Defendant on top of her, punching her and calling her names. Mrs. Roberts stated that after hitting her repeatedly, Defendant placed his forearm against her throat and put all his weight on his forearm. She testified she felt like she was dying because she could not breathe. She testified that Defendant twice pushed his forearm into her neck and throat, impeding her breathing.

Mrs. Roberts explained that the couple continued to struggle, with Defendant placing his hands on her throat, punching her, and slamming her head against the floor. Mrs. Roberts stated that she managed to stand, at which point Defendant threw her to the ground again and continued choking her with his hands. She noted Defendant eventually pressed his shin and knee against her throat, again preventing her from breathing. She testified that she was finally able to get Defendant off her, at which point he returned to the living room where Cameron had been when the attack started. Mrs. Roberts testified that she was unable to stop Defendant from going back to the living room, stating he again picked her up and slammed her onto

3

the kitchen floor before kicking, punching, and strangling her until she became unconscious.

Mrs. Roberts testified that the last things she remembered before passing out were that Cameron had hidden, that she felt she was going to die, and that Defendant kicked her in the head. The next thing she remembered was her neighbor, Dawnn Rommes, standing over her in the kitchen.

The neighbor, Ms. Rommes, also testified at trial, explaining that she became involved in the matter after finding Cameron upset in the front yard and seeing Defendant leave the home in his vehicle. When Cameron informed Ms. Rommes that her parents were fighting, Ms. Rommes sent Cameron into the Rommes' home and told her to lock the door. Ms. Rommes then entered the Roberts' home, finding Mrs. Roberts "laying on the kitchen floor." After Ms. Rommes called 911, Acadian Ambulance arrived, placed Mrs. Roberts in a C-spine with a collar, started I.V.s, and moved her into an ambulance. Mrs. Roberts was taken to Byrd Regional Hospital, where she later spoke with Deputy Sullivan of the Vernon Parish Sheriff's Office.[3] In addition to taking her statement,[4] Deputy Sullivan also took photographs of Mrs. Roberts' wounds.[5]

---

[3] Ms. Rommes' statement to authorities indicated:

I entered their home & saw Jen curled on the floor, trying to use her phone – which couldn't work w/her knuckle. She had visible abrasions on her mouth, both arms & neck (chest) areas. She said she couldn't move & I told her to stay still, as I called 911."

[4] Mrs. Roberts noted that Deputy Sullivan had to write her statement for her because her vision was impaired following the blows to her head.

[5] Referencing those photos at trial, Mrs. Roberts noted she had numerous hematomas on her head and numerous marks on her neck and throat area, including a mark just below her windpipe that she believed was caused by Defendant's putting his boot on her neck. Mrs. Roberts testified that she has several ongoing medical and mental ailments as a result of the attack.

The record indicates that Defendant was arrested two days following the incident. On July 10, 2018, the State initially charged Defendant with one count of misdemeanor domestic abuse battery against his wife, a violation of La.R.S. 14:35.3. The State subsequently filed a September 17, 2018 amended bill of information charging Defendant with felony domestic abuse battery by strangulation, a violation of La.R.S. 14:35.3(A) and (L). After Defendant waived his right to a jury trial in May 2019, the matter proceeded to a bench trial in October of that year.

At trial, in addition to Mrs. Roberts' testimony and photographs taken at the hospital, the State entered a purported video of the altercation into evidence at the bench trial. Mrs. Roberts explained that she recorded the footage of the attack from an eight-camera security system installed by Defendant about five weeks before the offense. Mrs. Roberts explained that she provided the recording to Detective Rhonda Jordan with the Vernon Parish Sheriff's Office. As addressed further below, Defense counsel objected to the introduction of the video of the incident, claiming it had no idea the video was recorded by the victim and not obtained by the Sheriff's Office on its own. The court, however, admitted the video and stated:

> All right, the testimony shows that it is the -- the same or substantially the same as it was. I know there's some technical difficulties and this -- this system did not actually have a disc that should be taken out. So, I am going to allow it. I will note your objection for the record, Mr. Fontenot.

Upon the State's playing of the video--which depicted the attack up to the point where the couple returned to the interior of the home—Mrs. Roberts confirmed that the video accurately depicted what happened on March 20, 2018, and verified Defendant was the person attacking her.

Defense counsel challenged the sufficiency of the State's evidence, in part by questioning Mrs. Roberts at length about why she used the phrase "impeded [her]

breathing" in court when she did not use that phrase in her prior statements, and pointed out that x-rays taken at the hospital did not show any breaks. Defense counsel also questioned Mrs. Roberts' own actions that evening, asking why she followed Defendant outside on the back porch, why she thought it was a good idea to confront Defendant about his drinking while he was drunk, and insinuating that she followed him outside simply because she knew there were cameras on the porch. Defense counsel then posed a series of questions regarding Mrs. Roberts' behavior after the attack, including reports she made to the FBI, attempts to have him removed from his Masonic Lodge, and an incident in which she blocked Defendant's vehicle in a parking lot. Defendant also raised questions regarding Mrs. Roberts' behavior during a court-ordered custody evaluation performed during the couple's divorce proceeding.

On redirect, Mrs. Roberts noted that while she did not explicitly use the word "impede" in her statements to police, she considered her comments to Detective Sullivan that Defendant choked her and stood on her throat with his boot to be actions which impeded her breathing. The State rested after the conclusion of Mrs. Roberts' testimony. Defense counsel then moved for a judgment of acquittal, stating:

> [T]he only person who has testified in this Court that her breathing was impeded is the victim. We have had a number of documents introduced into evidence from the hospital, none of which indicate a loss of consciousness or any report by the victim that she couldn't breathe. And in fact most of the test -- not most, all of the tests that were run -- run by the hospital show no evidence that she ever at any time had any difficulty breathing.

The trial court denied the motion.

In response, Defendant called several witnesses and offered documentary evidence in support of his position that Mrs. Roberts' trial testimony regarding her

6

breathing being "impeded" was contradicted by hospital records and investigative statements. Defendant also called a witness regarding Mrs. Roberts' behavior after the incident, including an incident in which Mrs. Roberts allegedly blocked Defendant's vehicle at a local restaurant, and events surrounding the above-referenced court-ordered custody evaluation by Ms. Robin Miley, a licensed professional counselor.

Ms. Miley, accepted by the trial court as an expert in custody evaluations, testified that she and Mrs. Roberts initially met, along with Cameron, and Mrs. Roberts agreed to let Ms. Miley conduct an interview with Defendant and Cameron. However, on the day of the evaluation, Ms. Miley noted that a Mrs. Faircloth called and spoke with Ms. Miley's office manager and explained that there was a protective order in place as well as charges pending against Defendant, so Ms. Miley called Defendant and told him not to come, instead meeting with just Cameron. Ms. Miley testified that she informed Mrs. Roberts' mother, who had accompanied Cameron, that she intended to call Defendant during the interview, at which point she was told an arrest was planned if Defendant showed up at Ms. Miley's office. Ms. Miley testified that during the phone call with Defendant, Ms. Miley never felt Cameron was afraid to be around Defendant.

Ms. Miley noted that Mrs. Roberts reported being "sexually abused when she was 11 years old and again recently. Physically assaulted as a teenager and over the past six years." Ms. Miley testified that she "felt that Ms. Roberts truly believed that she had been a victim of domestic violence[,]" but noted that Mrs. Roberts never told her she was unable to breathe or that her breathing was impeded during the subject attack. Ms. Miley testified that Defendant reported to her that he told Mrs. Roberts prior to the March 20, 2018 attack that he was planning to divorce her and

that she was opposed to divorce; however, Ms. Miley did not discuss the issue with Mrs. Roberts. Ultimately, Ms. Miley felt that both parties needed some psychological evaluation before she could make any recommendation as to custody.

On cross-examination, Ms. Miley confirmed that she did not speak to Mrs. Faircloth or Mrs. Roberts on the day of the interview with Defendant, simply that her office manager had spoken to Mrs. Faircloth. She also noted that no one ever told her the police had been called on Mr. Roberts and that law enforcement never contacted her regarding Mr. Roberts. Ms. Miley also noted that she was concerned with both the domestic abuse allegations against Defendant and his alcohol use, noting that Mr. Roberts was not as concerned about his alcohol use as he considered himself a "social drinker." She acknowledged, however, that Cameron stated Defendant's temperament was worse when he was drunk. Ms. Miley noted she felt Defendant increased his alcohol use after losing his job because he was bored, was self-medicating, was depressed, and was compensating for lack of control in his life. She also noted Defendant indicated he was still drinking at the time of the evaluation.

Defense counsel also called Ms. Rommes, the neighbor who found Mrs. Roberts on the kitchen floor. Ms. Rommes testified that she had lived across the street from Mrs. Roberts and Defendant for four years prior to the attack, and she and Mrs. Roberts had a sister-like connection at that time. Ms. Rommes testified, however, that she and Mrs. Roberts were no longer friends, in part because of things that Mrs. Roberts had said about that evening. While she confirmed that Mrs. Roberts had shown her the video recording and that it "pretty much sums up everything" as to what she was initially told, other statements from Mrs. Roberts on "Facebook Messenger" caused her concern. Ms. Rommes explained that:

[T]he first time that I had heard … a scenario that Michael had hurt Cameron that night … Jennifer had sent out a mass text on Facebook Messenger and it detailed what she said happened that night and I didn't agree with it because Cameron would have told me. I was very close with Cameron, she would have told me something.

On cross-examination, Ms. Rommes confirmed that she gave a voluntary statement to law enforcement wherein she stated that Cameron was hysterical, crying that her father was hitting her mother, and that when she found Mrs. Roberts on the floor, Mrs. Roberts could not move very well and had bruises and abrasions around her neck, mouth, and arms.

After the defense rested its case, the trial court found "beyond a reasonable doubt that the State did prove each and every element of the crime charged and [found] the defendant guilty of felony domestic abuse battery by strangulation." On January 21, 2020, the parties entered a stipulation that Defendant would be required to pay Mrs. Roberts restitution in the amount of $24,475.00.

The trial court thereafter sentenced Defendant as follows:

[I]t is the sentence of the Court, that on felony domestic abuse battery, you serve three years at hard labor with the Louisiana Department of Corrections and pay a fine of $500 plus court costs. I am going to suspend two years of that sentence. After you are released from prison, you will be placed on supervised probation for a term of three years subject to the general conditions of probation and the following special conditions. Pay the fines, restitution of $24,475 to Jennifer Roberts, and court costs per month on a pay plan through the probation office. Pay supervision fee in the amount of $60 per month plus five dollars and fifty … cents per month to the Sexo-Tech Fund. Complete a court-approved domestic abuse intervention program. It's also gonna be the order of the Court that you not own or possess a firearm throughout the entirety of the sentence. It's also the order of the Court that after you are released from prison, you will attend and complete a substance abuse evaluation and whatever treatment is recommended. I'm also gonna order that you not have any contact with Jennifer Roberts. And when I say "any contact," I mean any contact. You are not to drink any alcoholic beverage or step foot in any business whose primary business is the sale of alcohol while on probation. You're gonna comply with Code of Criminal Procedure Article 895(A).

## ASSIGNMENTS OF ERROR

Defendant appeals his conviction, assigning the following as error:

1.    Appellant contends that the evidence is insufficient and failed to establish [] an essential element of the crime charged herein.

2.    The Trial Court erred in admitting video from victim's phone into evidence.

*Errors Patent*

In addition to the two assignments addressed in his appellant's brief, Defendant also seeks review for errors patent on the face of the record, a review this court conducts as a matter of course pursuant to La.Code Crim.P. art. 920. Following that review, we find one such error and further determine that the court minutes are in need of correction.

The error pertains to the trial court's conditions of probation; namely, the order that Defendant make restitution to Mrs. Roberts in the amount of $24,475.00, and to pay a fine of $500.00 and court costs. The trial court ordered these to be paid "per month on a pay plan through the probation office."

However, when such payment plans are determined by the Office of Probation and Parole, trial court approval is required. In *State v. Stevens,* 06-818, pp. 3-6 (La.App. 3 Cir. 1/31/07), 949 So.2d 597, 599-601, this court stated:

> Upon reconsideration, we find nothing in the statute which prohibits the trial court from seeking assistance from outside sources, including Probation and Parole, in formulating the appropriate payment plan. In fact, Probation and Parole may be in a better position to formulate a workable payment schedule than is the trial court. In taking advantage of this assistance, the trial court in no way cedes its responsibility to impose the payment plan, and it only becomes effective upon approval of the trial court.
>
> . . . .
>
> Defendant's sentences are affirmed. . . . We remand the case to the trial court with the instruction that the court impose a payment plan

10

for restitution and for payment of the Indigent Defender Board which complies with the requirements of La.Code Crim.P. art. 895.1(A) and this opinion. We reiterate that the plan may either be determined by the trial court or be formulated by Probation and Parole and approved by the trial court.

Accordingly, as the trial court in this case anticipated that the plan would be formulated by the Office of Probation and Parole, we remand this matter to the trial court with directions to make certain the plan has been formulated and for its approval of that plan once formulated.

The trial court minutes of sentencing also require correction. The sentencing transcript reveals Defendant was placed on probation for a period of three years while the sentencing minutes indicate this period was two years. "[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Accordingly, the trial court is ordered to correct the court minutes of sentencing to accurately reflect that the term of Defendant's probation is three years.

*Assignment of Error Number 1 – Sufficiency of the Evidence*

In his first assignment of error, Defendant contends there is insufficient evidence to support his conviction because he claims the State failed to prove that as a result of his conduct, "the victim's breathing or circulation of blood was impeded by him applying pressure to the neck or throat." Defendant also contends that, aside from Mrs. Roberts' testimony and the video of the incident, "[n]o other evidence was presented by the State to support Mrs. Roberts['] contention that the conduct of [Defendant] impeded her ability to breath."

The photographs of Mrs. Roberts, however, taken at the hospital hours after the attack, clearly show bruising and damage to her neck and throat area.

11

Additionally, Mrs. Roberts testified extensively regarding Defendant's use of his weight against her neck, impeding her breathing.

The analysis for insufficient-evidence claims is well settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Undermining Defendant's contention that the evidence is insufficient as it is based primarily on the victim's testimony, the supreme court has explained:

A victim's or witness's testimony alone is usually sufficient to support the verdict, as appellate courts will not second-guess the credibility determinations of the fact finder beyond the constitutional standard of sufficiency. *State v. Davis,* 02–1043, p. 3 (La.6/27/03); 848 So.2d 557, 559. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the fact finder, is sufficient support for a requisite factual conclusion. *State v. Robinson*, 02-1869, p. 16 (La.4/14/04), 874 So.2d 66, 79.

*State v. Dorsey*, 10-216, pp. 43-44 (La. 9/7/11), 74 So.3d 603, 634, *cert. denied*, 566 U.S. 930, 132 S.Ct. 1859 (2012).

Defendant was convicted of domestic abuse by strangulation under La.R.S. 14:35.3(A) and (L). Strangulation is defined under La.R.S. 14:35.3(B)(7) as "intentionally impeding the normal breathing or circulation of the blood by applying

12

pressure on the throat or neck or by blocking the nose or mouth of the victim." Defense counsel did not refute the evidence of the attack itself but claimed that the State's evidence was insufficient as Mrs. Roberts did not use the phrase "impeded her breathing" until trial. The trial court clearly rejected this argument and stated:

> It was brought up on numerous occasions that Ms. Roberts never said the word impeded in any statement. The Court can tell you that, using my commonsense, I've also never used or heard the word impeding routinely used in conversation. I have heard or used the word choked or strangled. When I looked at the Byrd records, Ms. Roberts said -- or the record says, "The patient complains of pain to the throat and neck. She stated that he stood on her neck." The assessment was, "There was tenderness present in the neck." Her statement said, "He choked me, then stomped me in the throat area. He then stood on my throat grinding his foot into my throat." I then read Deputy Sullivan's report where she reported him "punching her in the face and choking her."

In ruling, the trial court referenced both the video of the attack and the photographs of the victim taken shortly after the attack. In particular, the judge explained that the video confirmed Mrs. Roberts' claims that Defendant held her down by the neck multiple times, including putting his knee and shin across her neck. Pursuant to *Dorsey*, the video is actually not necessary to find the State met its burden of proving beyond a reasonable doubt Defendant impeded the breathing of the victim during his attack. Defendant's argument regarding the admissibility of video is thus not determinative.

In particular, there is no internal contradiction or irreconcilable difference between Mrs. Roberts' testimony regarding the attack and the physical evidence. Despite Defendant's claim that the hospital tests show no damage to her neck, the evidence indicates that the only tests run were x-rays. Injury to a bone is not essential to the State's burden; it instead was required to demonstrate that Defendant "intentionally imped[ed] the normal breathing or circulation of the blood by

applying pressure on the throat or neck or by blocking the nose or mouth of the victim." *See* La.R.S. 14:35.3(B)(7).

Additionally, the photographs taken at the hospital clearly show bruising and swelling around Mrs. Roberts' neck and throat, supporting her assertions that Defendant stomped on her neck, used his knee and shin to put pressure on her neck, and that he choked her. Given this evidence, any reasonable trier of fact, when viewing the evidence in the light most favorable to the prosecution, could have found there was sufficient evidence to prove beyond a reasonable doubt that Defendant's attack impeded the breathing of the victim by applying pressure to the throat or neck. Accordingly, Defendant's claim of insufficient evidence lacks merit.

*Assignment of Error Number 2 – Admissibility of Video*

Defendant contends in his second assignment of error that the trial court erred in admitting State's Exhibit 1, a video of the attack. Defendant objected at trial after learning that Mrs. Roberts used her cellphone camera to record the video of the security footage. Mrs. Roberts then provided the video to law enforcement. Although defense counsel objected to the introduction of the video when it was presented during trial, the State made its intention to introduce both the video and the photographs of the victim taken at the hospital prior to Mrs. Roberts taking the stand. At that time, defense counsel specifically noted that he had no objection to either the video or the photographs.

The State contends that:

> Most importantly, the video, itself, plainly shows that it was copied from a computer monitor, at Ms. Roberts' home, by Ms. Roberts herself, on her cell phone, and was not an original CD provided by the security company. There was absolutely nothing contained anywhere in this video that would have led the defense to believe it was the original security camera surveillance recording, or that it was an actual duplicate, thereof, made by the security company. In fact, the record

14

shows that the State never indicated to the defense, in any manner, that this video was anything other than a copy made by Ms. Roberts and provided to the police.

The State also noted that the video was provided to defense counsel on January 15, 2019, with the DVD envelope stating it was "provided by the victim" and noting the evidence log, provided as part of discovery, clearly shows it was provided by Mrs. Roberts.

Review of the video confirms the State's arguments as it is immediately apparent that the video is not the original from the security camera. It is instead clearly a recording of the video. Additionally, on the video, Mrs. Roberts can be heard answering a phone call and having a conversation with the caller. The video was provided to the defense prior to defense counsel actually enrolling on January 31, 2019. Accordingly, trial counsel was in possession of the video, which is clearly a recording of a computer monitor, for over eight months prior to the commencement of trial. There is no indication that defense counsel sought clarification regarding the production of the video. Furthermore, defense counsel explicitly stated it had no objection to the introduction of the video when trial commenced.

In *State v. Coker*, 625 So.2d 190 (La.App. 3 Cir.), *writ denied*, 624 So.2d 1204 (La.1993), the State introduced the defendant's oath of office as evidence during a trial for malfeasance in office. The defendant objected, arguing the State failed to reference the oath of office during discovery when the defense sought disclosure of all evidence which might be favorable to defendant. This court noted:

> The appropriate remedy, if the defendant were dissatisfied with the State's incomplete response, would have been to submit a supplementary discovery request or to have filed a motion to compel discovery in order to force the State to fully answer the defense request. Considering the fact that the defense had a lengthy period between the time it received the State's response and the beginning of trial, the defendant had ample opportunity to assess the State's answers and

15

determine whether additional information was necessary. The defendant, therefore, suffered no prejudice as a result of the incomplete answer.

*Coker*, 625 So.2d at 194.

This court also stated, "Defense counsel propounded the request and must be held responsible for reviewing and evaluating the State's responses. Permitting any party seeking discovery to benefit at trial from its failure to pursue obvious deficiencies in responses to discovery would encourage 'sandbagging' by that party." *Id*.

In this case, Defendant was in possession of the video of the attack for more than eight months prior to trial. As in *Coker*, Defendant's failure to pursue additional information regarding the video during that time prevents him from now complaining that he was unaware the video was not an original. Furthermore, even if the video were inadmissible, any error would be harmless. As pointed out in the sufficiency review, Mrs. Roberts' testimony, coupled with the photographs taken at the hospital following the attack, as well as the hospital records, are sufficient to prove Defendant impeded Mrs. Roberts' ability to breathe during his attack. Accordingly, this assignment of error lacks merit.

## DECREE

For the foregoing reasons, Defendant's conviction and sentence are affirmed. This matter is remanded to the trial court for its approval of the payment plan formulated by the Office of Probation and Parole. The trial court is ordered to correct the court minutes to accurately reflect that the Defendant's term of probation is three years.

CONVICTION AND SENTENCE AFFIRMED.
REMANDED WITH INSTRUCTIONS.